Ruffin, C. J.
 

 The action is founded on the Act of 1777, ch. 118; which gives debt against a sheriff, who shall “wilfully or negligently suffer” a debtor taken in execution, to escape. The question turns on the meaning of the term, “negligently,” in the statute. It seems a little
 
 *150
 
 singular, that at tliis day a definition of that expression should be called for, in reference to an escape. It is true, the statute does not directly define it, but the meaning, we think, is not the less clear. It seems to have been used as a word before appropriated to one kind of escapes, which was then the subject of legislation, and as already having- a definite meaning in respect to that subject, and, therefore, not then needing explanation. At all events, it must be so understood. For it is an ancient rule for the construction of statutes, that, when they make use of words and phrases of a definite and well known sense in the law, they are to be received and .expounded in the same sense in the statute. This has been applied to statutes creating crimes, and especially when the enactments are merely affirmative; as in the Act of 1779, making the “stealing” of a slave a capital felony.
 
 Jerni-gam* s case,
 
 3 Mur. 13. Indeed, this rule is not confined to the construction of statutes, but extends to the interpretation of private instruments. There are exceptions to
 
 itf
 
 where it is seen that a word is used in a sense different from its proper one, in instruments made by a person
 
 inops consilii.
 
 But that is a condition in which the legislature cannot be supposed ; and, therefore, although the intention of the Legislature, as collected from the whole Act, is to prevail, a technical term, having a settled legal sense, cannot be received in any other sense, unless, at the last, it be perfectly plain on the Act itself, what that other sense is. This principle, which is as well one of common sense as of common law, seems to be decisive of the present question.
 

 There are, at the common law, two kinds of escapes : the one, wilful or voluntary, as it is oftener called: the other, negligent. Whether before or after judgment, the common law gave an action on the case for an escape of either kind. The difference, and the only difference, between the consequences of voluntary and negligent escapes of a debtor in execution, was that in the former
 
 *151
 
 case, the sheriff could not retake the party, whereas, in the latter he might; and, if he did so upon fresh pursuit, and subsequently kept the party in safe custody, the reception formed a defence to an action afterwards brought. In that state was the law, when the statutes 13 Ed. 1, c. 11, and 1 Ric. 2, c. 32, passed, and gave debt against sheriffs and the warden of the fleet, for escapes of debtors in execution. Immediately the principles of the common law, touching the two kinds of escapes, became applicable to the construction of the Acts, and they were applied to the actions given by the statutes as they had been to those given by the common law. The action of debt was held to lie as well for negligent, as for voluntary escapes ; and, indeed, evidence of the one might be given upon a count for the other. Nothing could purge a voluntary .escape, when prosecuted in either form of action ; and in both, recaption before action brought for a negligent escape, was a bar.
 
 Ridgeway’s case, 3
 
 Rep. 52.
 
 Bonafous
 
 v.
 
 Walker, 2
 
 T. R.
 
 126.
 
 The statutes were merely affirmative, only giving a cumulative remedy for escapes, without undertaking to define them ; and, consequently, they were, as to their diversities in nature, and in their defences, left to be ascertained by the common law. What was before a wilful escape remained so still; and to the action of debt for it there was no de-fence, that would not have equally barred an action on the case. So, likewise, it was with respect to a negligent escape, It was constituted as before; no old bar was taken away, nor any new one given. The liability of the officer in debt, depended, then, entirely upon the enquiry, whether he would be liable in the action on the case. Recourse was, therefore, necessarily had to the common law, to determine what is an escape, and what a wilful or a negligent one. Whenever a person, once under arrest, is at large, unless by the consent of the creditor, or the authority of law, it is an escape. It is said by Mr. Justice Bullep, in
 
 Bonafous
 
 v.
 
 Walker,
 
 to be voluntary,
 
 *152
 
 when it is by the consent or default of the officer. All other escapes are negligent. To the same purposes respectable
 
 text
 
 writers speak. Mr.
 
 Phillips
 
 says, “if it be with the knowledge or consent, or by the default of the gaoler, or sheriff’s officer, it is a voluntary escape ; if, without his knowledge, it is a negligent escape,” 2
 
 Phill. Ev.
 
 397.
 
 Mr. Stephens’ N. P.
 
 1212, states “that an escape is negligent, when the party escapes without the consent of the sheriff or his officer ; voluntary, where the shei'iff’or his officer permits him. to go at large,” And the words of Mr. Selwyn, N. P. 450, are, that “voluntary escapes are such as are by the express consent of the gaoler ; negligent, when the prisoner escapes without the knowledge or consent of the gaoler ;” and he adds upon tlm authority of
 
 Stonehouse
 
 v.
 
 Mullins,
 
 Str. 873, “(hat in either of those cases an action of debt may be maintained against the sheriff.” In pleading also, the same distinction is kept up. In a plea of fresh pursuit and recaption, it is stated, “that the said L. tí (the debtor) forcibly, wrongfully, privily, and without the permission, consent, knowledge, or default of the said defendant escaped,” &c.; and the replication is, that the defendant “permitted and suffered” (or “voluntarily permitted and suffered”) the said L. S. to go at large, whither he would, and to escape out of the custody of the defendant, &c.
 
 Chitt. Pl. 957
 
 —8 9,
 
 C.
 
 1170 — 7
 
 Went. 553. et seq. 5 Went.
 
 228. Though differing slightly in words, these various passages agree in substance, that every going out of prison, with the knowledge or default of the keeper, is a voluntary escape, and that without his knowledge or default, it is a negligent one : and, that, for the purposes both of the action on the case, and of debt. Indeed, it it was so held in express terms by the Court of Common Pleas, in
 
 Alsept v. Eyles,
 
 2 H. Bl. 108, in Trinity term, 1792 ; and in so holding the Court proceeded on a long train of authorities from a remote period up to that time, and not weakened by a single one to the contrary. It is
 
 *153
 
 remarkable that at the same term, the question was also before the Court of King’s Bench in
 
 Elliott
 
 v.
 
 The Duke of Norfolk,
 
 4 T. R. 789; in which, without hearing the plaintiff’s counsel, the Court sustained a demurer to a plea, that a mob of divers persons, riotously and feloniously with force (the said force being so great and violent that the defendant could not resist it) demolished the prison and rescued the debtor against the will of the defendant, and although he did as much as in his power lay to prevent the same. It is thus seen, that in the .action of debt, as well as in case, the officer is liable for either kind of escape ; except that when the escape is only negligent, the action will not lie unless brought before re-caption, and except further that it will not lie at all when the escape was occasioned by the Act of God, or the public enemies. Although these positions were not disputed by the defendant’s counsel, but were admitted to be law in England, yet it was necessary to advert to them particularly, for the better understanding of the grounds on which they rest, and their bearing on the construction proper to be placed on our statute. For, while it was admitted, that such was the nature of the escapes for which the common law gave and gives the action on the case, and for which debt is also given in England, by her statutes, it was contended in argument, that, by reason of the difference in the language of those statutes and ours, and of the difference in the condition and policy of the two countries, ours should receive a different construction — one whereby the sheriff is to be liable for such negligent escapes only, as spring from' “ actual negligence,” or, from “ gross and culpable negligence,” as was contended for in another another case against this defendant at the present term. But neither the- one nor the other of those reasons can, we think, produce the effect insisted on. So far from it, the difference between the enactments -skews an intention to make ours the more explicit against the sheriff.
 

 
 *154
 
 The language of the
 
 St. Westm.
 
 2, is, “ Let the sheriff take heed that he do not suffer (non-permittat) him to go out of prison without assent of his master; and if he do, and thereof be convict, he shall be answerable to his master of the damages done to him by such servant, according as it may be found by the country, and shall have his recovery by writ of debt.” The statute, 1
 
 Ric.
 
 2, after reciting that persons, divers, “at the suit of the party, commanded to the prison of the Fleet by judgment, be oftentimes suffered to go at large by the warden of the prison, sometimes by mainprise or by bail, and sometimes without any mainprise with a bastón of the fleet, &c. without their assent, at whose suit they were judged, and .without their gree thereof made, whereby a man cannot come to his right, and recovery against such prisoners, to the great mischief and undoing of many people,” then ordains, “ that from henceforth no warden of the fleet shall suffer any prisoner, there being by judgment at the suit of the party, to go out of prison, without making gree to the said parties of that whereof they were judged, unless it be by writ, or other commandment of the King, upon pain to lose his ofBce. And, moreover, if any such warden from henceforth be attainted by due process, that he hath suffered or let such prisoner to go at large against this ordinance, then the plaintiffs shall have their recovery against the same warden by writ of debt.” The recital in the latter statute is only of escapes that are clearly voluntary, and the operative words of the former are,
 
 “ suffer
 
 to go out of prison,” and of the latter, “
 
 suffer or let
 
 such prisoner go at large;” and therefore it might very plausibly have been contended, (as it was, as late as the case of
 
 Alsept
 
 v.
 
 Eyles,)
 
 that, by a fair construction, they only gave debt for escapes with the knowledge and actual permission of the officer. Yet the contrary has been uniformly deemed the proper construction ; and it was held, first, that debt would lie for a negligent escape, and, secondly, that in order to sup
 
 *155
 
 port the action it was not necessary to shew any specific act of negligence, as every escape, not arising from the act of God, or the King’s enemies, was in law a negligent escape at the least. Why was this? The answer is obvious. It is, that the statutes merely give a new remedy for escapes generally, without undertaking to define them, and without excepting a negligent escape; and therefore that the action must lie for whatever was by the common law an escape, for which an officer was, at the common law, liable in damages. Hence, Lord Coke makes no distinction between voluntary and negligent escapes, in his comments on the statutes, 2
 
 Inst.
 
 382. And Lord Loughbokough in delivering the judgment of the Court in
 
 Alsept
 
 v.
 
 Eyles,
 
 cites a case from the year book 33
 
 lien.
 
 6, of an action of debt, for an involuntary escape. The same point was expressly decided in
 
 Stone-house
 
 v.
 
 Mullins,
 
 and in the other more modern cases already cited. Thus the statutes were construed in reference to the common law; and in giving debt for “ an escape,” they were necessarily held to mean whatever was legally an escape, whether voluntary or negligent. Then, how much more conclusiyely is the Court here bound to take the terms of art employed'in our Act, according to their previous legal acceptation, as equally embracing both kinds of escape as understood at the common law, when it does not merely say, that debt shall lie, if a sheriff “ suffer” a debtor to “ escape,” but its tenor is, that it shall lie, if he “wilfully
 
 or negligently
 
 suffer “ such” “ escape ?” How is it possible for us to suppose, that the Legislature meant in this Act a different kind of negligence from 'that which was known to the common law and had been applied to the statutes of
 
 Ed.
 
 1, and
 
 llic.
 
 2 ? It was argued, indeed, that, inasmuch, as the English statutes were in force heTe, some difference is to be implied from the fact of passing a statute here on the subject; and that the implication is strengthened by the change of phraseology in ©urs;
 
 *156
 
 and then, as our policy is less stringent than that of England in enforcing payment of debts by process against the person, it is insisted that it is a reasonable hypothesis, that the difference intended was, that in the case of a negligent escape, the negligence must be actual, gross, and culpable. But that course of reasoning is not just, according to the analogies of the law, nor in furtherance of justice, and good morals. Very sufficient reasons may be assigned for the enactment or re enactment by our Act, without recurring to the considerations supposed. It does not appear that the statutes of
 
 Edward
 
 and
 
 Richard, were
 
 ever in use here, and it is not certain that, from their terms, they would have been deemed in force. At any rate, they were couched in terms, that had, in some degree, become obsolete, and were in themselves so vague, as to have made it necessary to resort to a latitudinous equitable construction, in order to embrace cases and persons that were within the mischief,
 
 though not the
 
 letter of those statutes. It is more consonant with modern and just legislation, that the statute laws should plainly and directly provide for all they are intended to cover, instead of employing the vague generalities of the early ordinances of parliament. Besides, our Act w*as necessary, in order to extend the remedy for escapes to cases of attachments or executions for money decreed in Chancery; and, again, to make the action survive, as well against the executor of the sheriff, as for the creditor’s executor, which was not the case in England,
 
 Dyer
 
 '271, 323. 1
 
 Raym.
 
 399. These considerations sufficiently account for the enactments of our statute, and for its particular provisions.
 

 That the language used in it is to receive a different interpretation from that which it ought and would, were it an enactment of the British parliament, because in the habits of our country, and the course of our legislation it is supposed a policy is seen less favourable to the rights of creditors, than that which has prevailed so steadily
 
 *157
 
 ill tbe mother country, is altogether inadmissible. In a republic, as much, at least, as in a monarchy, the laws as made and as administered, should make men honest in the payment of their debts, and officers faithful in the performance of their duties. Nay, it is of more consequence in a republican government; for its stability and wholesome operation depend more essentially on the virtue of the people, and nothing is more speedily or certainly destructive of private and of public virtue, than to relax the obligation of contracts, and render the rights of creditors insecure. It is doing some evil, and we think much injustice to our institutions, to suggest that such a course has been settled on here, or that there is a tendency to it. The supposition cannot be tolerated, that the law is of less binding force here than in any other country. The judiciary, at all events, can never adopt it, unless it should become — that greatest ef curses which can befal an unhappy and degraded country — dependent, and then, necessarily the weak, or pliant instrument of popular impulses. The Courts can act upon no such principle further than they may be compelled by positive and unequivocal constitutional enactments. None such have, as yet, passed ; and we trust, they never will. The statute now under consideration is, on the contrary an honorable monument to the purpose of sustaining the modes derived from our forefathers of enforcing the satisfaction of recoveries by judgment. It seems, indeed, to be somewhat characteristic of the present age to regard, with less severity than formerly, the contracting of debts which the party is not able in the event to pay. The world is making an experiment, how far the morals of mankind can be preserved, while persons shall be exempted from bodily restraint or punishment for such delinquencies. Our legislature, like others, has, to some extent, ventured on this experiment. The issue can be made known, with certainty, only by time. But all the changes, as yet made in our law, profess to be for the relief, only, of honest in
 
 *158
 
 solvents : that is to say, honest, in the sense, at least, of having no property, or of giving up what they have. There may be a difference of opinion about the policy of that degree of immunity for obtaining a credit, to which one was not entitled ; and the details of the system may be defective in not sufficiently guarding against fraud in contracting debts and disposing of the debtor’s property. If that be so, it only shews that the system needs amending. But it is very far from shewing a legislative intention or popular purpose, either to exonerate dishonest debtors — those who have property but conceal it, and will not surrender it for the benefit of creditors — from imprisonment altogether, or to subject them only to the insecure custody of an irresponsible keeper. As to such debtors, the principles of the laws of our ancestors, whether the unwritten or the written laws, are preserved in full vigor here. We have the same executions against the body ; and, if the debtor cannot, or will not avail himself of the benevolent provisions of the acts for the relief of insolvent debtors, he is liable to the same close and safe custody, which the policy, and the morality of the common law prescribed, as the means of enforcing payment of debts. It follows, if the gaoler will not execute the law in that respect, but from any cause, which he was not incapable of counteracting, “ suffers or lets prisoners to go at large,” (as expressed in
 
 St.
 
 1,
 
 Ric. 2,)
 
 “without their assent, at whose suit they be judged, whereby a man cannot come to his right and recovery against such prisoners, to the great mischief of many people,” that the creditor ought to have redress against the gaoler ; and that, not merely in damages, which the jury may, in the dark, suppose to be adequate to the loss or inconvenience to the creditor, but, to prevent such defaults, voluntary or negligent, and to render the redress effectual, by giving to the party, in the words of Mr. Justice Bulleu, that remedy against the gaoler, which he had against the debtor. Such is the plain and expressed intention of the
 
 *159
 
 Act of Assembly. Unfortunately too, for the argument drawn from the supposed opposition in the policy of our present and former governments, these provisions were not first introduced into the statute book by the Act of 1777. They form parts of an Act of 1755, Ch. 2, found in the revisal of Davis, printed in 1765. By the 2lst section, a summary judgment on motion is given against a sheriff, who hath levied or received any money on execution, or hath taken the body of any defendant upon execution and “ suffered him or her to escape with the consent of such sheriffand by the next section it is enacted, ‘‘that where any sheriff shall have taken the body of any debtor in execution, and shall wilfully or negligently suffer such debtor to escape,” the creditor and his executor may have an action of debt against the sheriff and his executor. The act thus evidently preserved the legal ideas of the different kinds of escape — in effect defining that which is wilful to be an escape “with the consent of the sheriff,” and, consequently, that a negligent escape was one without such consent. If the term “ negligent” is to be understood in any other sense than its ancient one, we ask, in what other signification' did the legislature use it, as faras can be collected from the act ? What is meant by “actual,” or “gross and culpable” negligence, in reference to escapes ? The law had said, that there was negligence, which made the sheriff culpable, and liable to the party’s action, if the escape occurred without the act of God or the public enemies ; and there is nothing in the act to say, that it should not be so deemed. Sheriffs are not the only persons, of whom the same degree of diligence is exacted- It is required also of common carriers — the law properly putting both on the same footing, because the same reasons apply equally to both-Lord Coke so treats them in
 
 Southcoie’s case
 
 4
 
 Step. 83.
 
 They each undertake a duty for reward, and it is a duty of such a nature as to present constant opportunities and strong temptations to betray the trust, if evidence of col-
 
 *160
 
 jusion or of some particular omission of due care and caution were necessary to charge them. The security of those, who employ common carriers and keepers of prisons, from the most mischievous unfaithfulness, renders it indispensable, that they should be insurers; and, therefore, the law pays them, and justly holds them responsible, as such.
 

 There is another consideration, which presses strongly against receiving “ negligent escape” in the act in any new sense. It is, that it would put an end at once to the beneficial and well established doctrine of recaption or fresh pursuit. Although the law will not allow the sheriff to imprison and enlarge the party at his caprice from time to time, and, therefore after a voluntary escape, the sheriff cannot re-take the party, yet it is otherwise when the escape is without the connivance of the sheriff and merely negligent. In this latter case, the debtor has no claim on the benignity of the law, even against the sheriff, for exoneration from re-imprisonment, and therefore the sheriff is allowed to re-take him. If the creditor choose to hold back and not sue the sheriff for the escape, until he shall have been at the trouble and expense of a re-capture, and incurred the further risk of the debtor’s detainer thenceforward, until he satisfy the judgment, the law may well, and does deny, any action for the previous escape. But it is manifest that this supposes that an action lay for the escape thus purged by the recaption ; and hence arise the interest, power, and duty of the sheriff to recapture. Therefore, if in any case the creditor could not have his action against the sheriff for the escape itself, there would be no motive or obligation on the sheriff to retake the debtor. For, the law does not give the action of debt for a default of the sheriff in not taking the body in execution or retaking it; but only for an escape from custody. Hence, if there be an escape by the act of God, or the public enemies, no action arises therefor ; and if in such case the debtor appear openly, there is no ques
 
 *161
 
 tion, that the right to the action of debt would not arise for the default of the sheriff in not retaking him, but the creditor would be put to another
 
 ca. sa.
 
 Now, if the action does not, by our statute, accrue upon the fact of the escape, as legally importing negligence, but only when it is shown, that there was “ gross and culpable negligence and committing the debtor to a new prison that was supposed to be secure, and locking him in, is to defeat the action as the act of God, or of the public enemies does, it follows that the sheriff is not obliged, in this case, more than in the other, to retake the debtor, in order to give him a bar to the creditor’s action — for, upon this hypothesis, the action of debt never arose. It is true, the creditor might issue a new
 
 ca. sa. ;
 
 but that would only .be effectual, if the debtor remained within the jurisdiction, and, indeed, would give that sheriff no authority to go out of his county. . The legislature can never be supposed to have intended, that a sheriff should be thus excused for an escape, though he make no effort to retake the debtor, and that recoveries by judgment should be thus defeated. Moreover, that the escape took place from a new and sufficient gaol is no palliation, but, upon legal analogy, an aggravation of the negligence, by which it. happened. Thus, a sheriff may return a rescue upon
 
 mesne
 
 process, as he carries the party to gaol; yet, if he get him once within the prison, though the custody be by
 
 mesne
 
 process only, he must hold him at all events, and a rescue will be no excuse, unless it be by the public enemies. This is laid down, by Chief-Justice Peatt in
 
 Crompton
 
 v.
 
 Ward,
 
 Str. 429, as law, not to be disputed. It is as indisputably law, that a rescue of one taken in exe'eu. tion, and on the way to gaol, cannot be returned, unless it be by public enemies; for a sheriff is bound, in such case, to have his
 
 posse
 
 sufficient to overcome all fore© from rioters or mobs.
 
 Dyer
 
 241,
 
 May
 
 v.
 
 Probi,
 
 Cro. Jac. 419. By parity of reasoning, it follows, that still less can
 
 *162
 
 a rescue excuse the sheriff, after he has the additional security of the walls of the prison for the custody of his prisoner in execution.
 

 This question has been discussedthus elaborately, not because it appeared to the court to have any intrinsic difficulty, but from the respect due to the opinion, to the contrary of the learned Judge, who presided at the trial, and to the zealous, full, and able argument at the bar; and, moreover, because the point is of importance in itself. No member of the Court, however, has entertained any doubt on
 
 it; but we have
 
 all (including our late brother Daniel, who heal’d the argument,) considered it plain, both upon the general reasons here given, and as concluded by adjudications in this State. We know that there have been many recoveries on the circuits both in case, and debt for negligent escapes, as understood at common law. The propriety of them was never questioned, except in the single case of
 
 Rainey
 
 v. Hemming,
 
 2
 
 Murph. 386 ; and there the eminent Judge, who sat in the Superior Court, did not hesitate, as soon as he had the opportunity of looking into the authorities, and conferring with the other Judges, to retract his opinion, and become the organ of the Court to reverse his judgment. The case was decided at the last term of the Supreme Court, as formerly constituted, and, both Judge Daniel, and I were members of it, and remember that neither of the five Judges, then in the Court, had the least doubt of the law, as there laid down, and of its application to the action of debt, as well as to the action on the case then before the Court. It would be strange, indeed, if that, which is in law a negligent escape in one action, should not be a negligent escape in another action.
 

 All the considerations, then, that can weigh with a Court, the just principles for the interpretation of statutes, the authority of adjudications, and ancient writers on the law, and a regard to sound policy, and good morals—
 
 *163
 
 concur in producing the conviction, that the judgment is erroneous.
 

 Per Curiam. Judgment reversed, and
 
 vtnire do novo
 
 awarded.