W. A. BROWN et al. vs. ROBINSON BROWN.*

*Cherokee Lands—Legislative Control over Public Lands— Grants, Void and Voidable—Construction of Statues not based on Policy—The Code, §§ 2346, 2347.*

1. A grant of lands within the Cherokee Indian boundary is void.

2. It is the province of the legislative department to prescribe when, how, and for what purpose the lands of the State may be granted. In the absence of such legislation neither the Governor, Secretary of State nor any agency can pass title to State lands by grant or otherwise.

3. A grant of lands *not subject to grant* is void and can be attacked collaterally. If the land granted *is subject to grant,* but the grant itself was obtained by fraud, or there were irregularities attending its issue, it cannot be attacked *collaterally.*

4. What is called the policy of the Legislature is too uncertain a ground upon which to found the interpretation of statutes, especially when the statutes are clear and absolute in their terms and expressed purpose.

5. The treaty of Holston between the United States and the Cherokee Indians did not have the effect to repeal or modify the entry laws of this State.

The opinion in this case was delivered at September Term, 1888, but a petition to rehear having been filed, it was not reported until the decision of the application to rehear. Both opinions are now reported in the order in which they were delivered.

This action was brought to recover the land described in the complaint. On the trial the plaintiff introduced in evidence and relied upon a grant from the State, issued to David Allison on the 29th day of November, 1796, for 250,240 acres of land, described by metes and bounds, but the description did not mention what was commonly called the

---

*AVERY, J., did not sit in this case.

"Indian reservation," nor was that reservation, or what was known as "the Meigs and Freeman line," mentioned or referred to in the grant.

There was evidence that the lands in controversy were not within the old Indian reservation, but were on one side of it, and east of the Meigs and Freeman line, which established the Indian boundary line, and that the same was situated between the waters of Wolf and Tennessee creeks, and immediately on Wolf Creek, and it was shown that both of said creeks flowed into the Tuckaseege River.

The defendant introduced no evidence.

As to the grant mentioned; his Honor charged the jury, that the boundary line of the State grant to David Allison extended along the dividing ridge between the waters of Pigeon River and Tuckaseege River, and did not include any of the land lying on the waters of the Tuckaseege River, they not being subject to entry at the date of the Allison grant. To this the plaintiffs excepted.

There was a verdict and judgment for the defendant, and the plaintiffs having assigned error, appealed to this Court.

*Messrs. M. E. Carter, R. D. Gilmer, W. W. Jones* and *Theo. F. Davidson,* for the plaintiffs.
No counsel for the defendant.

MERRIMON, J. (after stating the case). The instruction of the Court to the jury, excepted to, rests upon the ground that the evidence of the plaintiffs, accepted as true, proved that the lands in question were situated between the waters of Wolf and Tennessee creeks, immediately on Wolf Creek; that both of these streams flowed into Tuckaseege River; that the line between the land of the State and the same of the Cherokee Indians, at and before the date the grant mentioned was issued, began "on the Tennessee where the southern boundary of this State intersects the same nearest

to the Chickamauga towns; thence up the middle of the Tennessee and Holston to the middle of French Broad; thence up the middle of French Broad River (which lines are not to include any island or islands in the said river) to the mouth of Big Pigeon River; thence up the same to the head thereof; *thence along the dividing ridge between the waters of Pigeon River and Tuckaseege River, to the southern boundary of this State,*" and that the land being situate on the waters flowing into the Tuckaseege River, and within the boundary of lands belonging to the Cherokee Indians, the grant, if it embraced the lands in question, was as to them void, because the laws of this State prevailing at and before the date of the grant did not allow, but on the contrary forbade, such lands to be entered and granted by it.

The Court said, " the boundary line of the State grant to David Allison extended along the dividing ridge between the waters of Pigeon River and Tuckaseege, and did not include any of the land lying on the waters of the Tuckaseege, they not *being subject to entry* at the date of the Allison grant," and we are of opinion that this instruction was correct.

It is not denied that the grant to David Allison could not pass the title to the land in controversy to him, if that land was not subject to entry and grant under the laws of this State at the time it was issued. It is the province of the law-making power of the State to prescribe, by proper enactments for the purpose, when, how, and for what purpose and considerations its lands shall become the property of individuals, and how and by what means of conveyance the title thereto shall pass to them ; and in the absence of such enactment neither the Governor nor the Secretary of State, nor any agency, can pass such title by grant or otherwise. Hence, what purports to be a grant of lands, which the law has not made the subject of entry and grant, is void, and it will be so treated in all courts. It would be otherwise, how-

·ever, if the land was subject to entry and grant, and the grant should be impeached for fraud, defects, and irregularities in matters and things preliminary and leading to its ·execution and issue.  In such case it could not be attacked ·collaterally—it could be impeached only by an action brought to have it declared void.  Fraud or mere irregularities may be waived, but that which is essential to give life and operative effect to the grant cannot be waived.  The Court will regard it as void whenever it appears that the essential requisite is absent. *Reynolds* v. *Flinn*, 1 Hay., 123 (106); *Avery* v. *Strother*, Conf. R., 434; *Lovinggood* v. *Burgess*, Busb., 407, and cases there cited.

Then, adverting to the law applicable and prevailing at the time the grant under consideration was issued, it appears that the statute (Acts 1777, 1 Pot. Rev., ch. 114, p. 274) provided "for establishing offices for receiving entries of claims for lands," and granting the same.  That statute was afterwards amended by the statute (Acts 1778, 1 Pot. Rev., ch. 132, p. 354), and section four thereof prescribes "that for the future no person shall presume to enter or survey any lands within the Indian hunting grounds, or without the limits of the land heretofore ceded by the Indians or conquered from them, which limits westward are hereby declared to be as follows, that is to say," &c.  Such limits were particularly prescribed, and all the lands embraced by the grant in question were, at the time of and before the enactment of this statute, within the boundary of the land so set apart to the Cherokee Indians, and, therefore, not subject to entry and grant.  It is further declared in this statute "that all entries and surveys of land heretofore made, or which hereafter may be made, within the said Indian boundaries, are hereby declared to be utterly void and of no effect."

The operation of the above mentioned statutes was suspended by the subsequent statute (Acts 1782, 1 Pot. Rev.,

ch. 172, p. 413), but this statute was repealed by a subsequent one (Acts 1783, 1 Pot. Rev., ch. 185, p. 435, *The Code*, §§ 2346, 2347). and the latter amended, modified and re-enacted that first above mentioned. The fifth section of the last mentioned statute prescribes the boundary of the lands of the Cherokee Indians, just as recited above in the first paragraph of this opinion, and the sixth section thereof prescribes "that no person shall enter and survey any lands within the bounds set apart for the Cherokee Indians, under penalty of fifty pounds specie for every such entry so made, to be recovered in any court of law in this State by and to the use of any person who will sue for the same; and *all such entries and grants thereup on, if any should be made, shall be utterly void*."

These enactments make manifest the settled purpose of the Legislature not to allow any lands, while they continued in force, within the boundary prescribed of the lands set apart to and for the Cherokee Indians, to be subject to entry and grant. The terms employed to express such purpose are strong, unequivocal and mandatory. Such entries and grants are expressly forbidden, and if such entries were made or grants issued, they were declared to be utterly void.

This fixed purpose appears in subsequent statutes (Acts 1809, 2 Pot. Rev., ch. 774, p. 1161; Acts 1817, 2 Pot. Rev., ch. 950, p. 1408). Indeed, such purpose appears in all subsequent legislation in this State in respect to the Cherokee Indians and " Cherokee lands," a fruitful subject of legislation. And it seems to us that there can be no reasonable doubt that the boundary line specified in the statute above cited (Acts 1783, ch. 185, § 5), continued to be the boundary line until that statute was repealed, amended or modified by appropriate legislative enactment, and that for all appropriate purposes it continues to be such to this day. It is expressly recognized in *The Code*, §§ 2346, 2347.

The pertinent statutes above mentioned were in force at the time the grant in question issued and the entry on which it was founded was made. It was, therefore, " utterly void" as to any land embraced by it within the boundaries of the land so set apart to the Cherokee Indians. It appeared on the trial that the land in controversy was situate within that boundary ; that is, on the waters that flowed into the Tuckaseege River, and within the grant. As we have seen, the grant was, as to it, inoperative and void—passed no title.

The plaintiffs contended that the " treaty of *Holston,*" concluded on the 2d day of July, 1791, between the United States and the Cherokee Indians, extinguished the title and right of those Indians to the territory embracing the lands embraced by the grant in question, and that by such treaty and extinguishment these lands became the property of this State, and subject, as a consequence, to entry and grant.

Whatever other effect the treaty mentioned may have had, it certainly could not have repealed or modified a statute of this State that expressly forbade the entry and grant of the land within the boundary mentioned in such or any respect. There was nothing in the several statutes cited above, or any other statute within our knowledge, that, in terms or by just implication, rendered the lands of the Cherokee Indians subject to entry and grant under the laws of this State, when and as soon as their title to these lands should be extinguished in its favor. On the contrary, they were expressly and without qualification excepted from the operation of the entry laws.

It was said on the argument that the purpose of such exception was based upon the *policy* of the Legislature to pacify the Indians, to cultivate peace and friendship with them, and to protect them from the aggressions and depredations of the white people; and when they ceased to own the land set apart to them, the policy and purpose of the statute and the exception were over—ended—and ceased to

have operative effect. But the statute does not so declare, and there are no words or provisions in it that imply that it shall operate only so long as the Indians shall continue to own the land. Moreover, what is called the *policy* of the Legislature, in respect to particular enactments, is too uncertain a ground upon which to found the judgment of the Court in the interpretation of statutes, especially when they are clear, unequivocal and absolute in their terms and expressed purpose. It seems to us that it would be an unwarranted stretch of judicial authority to declare that the statutory provision in question was in effect repealed by the treaty mentioned, and go still further and hold that the lands affected by it, as a consequence, at once became subject to entry and grant. Conceding that the Indian title to the land was extinguished by the treaty, it was the province of the Legislature to repeal or modify the statute and make disposition of the land, as it did do by subsequent legislation from time to time, but not in accordance with the general entry laws.

The appellant's counsel cited and relied upon the case of *Strother* v. *Cathey*, 1 Murph., 162, which decides "that although the act of 1783 (the statute in question) has not been expressly repealed by the Legislature, yet it is effectually and substantially repealed by the treaty"—that mentioned—and an entry of land within the Indian boundary made in 1791, and the grant issued therefor in 1803, were upheld as valid and effectual. That case was decided by only two Judges, whose reasoning and interpretation of the statutes opposite, it seems to us, are not satisfactory. It is directly opposed by the case of *Avery* v. *Strother*, Conf. Rep., 434 (Tay. & Conf. Rep., 496), decided by four Judges. In this case the entry was made in 1791, after the treaty mentioned, and the grant issued on the 4th of January, 1792. It appeared that the entry was not made in a proper county, but the Court expressly declared that the statute of 1783

above cited, was then—after the treaty—in force, and that the entry and grant were therefore void and passed no title.

In the case of *Strother* v. *Cathey, supra,* the Court laid much stress upon the clause of the statute of 1777 above cited, which required the entry-taker to "receive entries for any lands lying in such (any) county which have not been granted by the Crown of Great Britain or the Lords Proprietors of Carolina, or any of them, in fee before the 4th day of July, 1776, or which accrued *or shall accrue* to the State by treaty or conquest," but surely this general provision could not be construed as embracing lands particularly and positively excepted from entry and entry laws by subsequent enactment, unrepealed, as we have pointed out above.

The appellant's counsel insisted, also, that the boundary line of the Indian lands was not certain and fixed as appears from the statute (Acts 1809, 2 Pot. Rev., ch. 774, p. 1161), which made what is there designated as the "line run by Meigs and Freeman" a permanent boundary line of the Indian lands. This line was the result of treaty stipulations subsequent to the boundary first above recited and established, and it was not surveyed and settled until 1802, long after the grant in question issued. The boundary line prescribed by the statute of 1783 was a certain line marked by natural boundaries, unmistakable, and there could be no doubt as to its location.

What we have said is conclusive against the appellant, and we need not advert to the second exception.

No error.                                    Affirmed.