## J. W. RANDALL v. THE RICHMOND AND DANVILLE RAILROAD COMPANY.

*Live Stock, Injury to—Negligence—Statute, Interpretation of.*

1. Where it is proven or admitted that cattle had been killed by the train of a railroad company within six months before the action was brought, there is a presumption that the killing was caused by the negligence of such company, and this presumption arises from the fact of killing (under section 2326 of *The Code*), where the animal is hitched to a wagon or cart, as well as where it is straying at large when killed.

2. Where the language of a statute is not ambiguous, the Courts are not allowed to consider extraneous reasons, or to resort to the preamble of the act even, in order to give to its words any other than their technical meaning, if they have such signification, or their ordinary meaning, if they have no legal signification; and where the language of the law is clear, it is judicial legislation to look beyond its obvious meaning to ascertain the motives of the legislators in order to interpret it.

3. Where the language of the statute is doubtful, the argument of inconvenience may be considered, but where it is clear, and the legislative intent is manifest, the Courts are not at liberty to be governed by considerations of inconvenience in interpreting its meaning.

PETITION to rehear, filed by defendant, and heard at the September Term, 1890, of the Supreme Court. (See 104 N. C., 410.)

No counsel for plaintiff.
*Messrs. C. M. Busbee* and *Charles Price*, for defendant.

AVERY, J.: Counsel contended in this Court that there was error in the opinion delivered at the September Term, 1889, in giving too strict a construction to the statute (*The Code*, § 2326), which provides that, "*when any cattle or other live stock* shall be killed by the engines or cars running on any railroad, it shall be *prima facie evidence of negligence* on

the part of the company in any action for damages against said company: *Provided,* that no person shall be allowed the benefit of this section unless he shall bring his action within six months after his cause of action shall have accrued."

The plaintiff was driving oxen along the public highway, near the defendant's road, hitched to a cart, when they were killed by the defendant's engine running on its track, the oxen having been so frightened by the approach of the head-light of the engine, as it suddenly turned a curve, that they jumped upon the track. Did the Judge below err when he instructed the jury that the fact of killing the oxen by the engine being admitted, there was a presumption of negligence on the part of the defendant? We think that he was not in error in so declaring the law. The word "cattle" is defined by Webster, when used in its more restricted sense, as meaning "quadrupeds of the bovine tribe," and, used as a generic term, as "including all domestic quadrupeds, as sheep, goats, horses, mules, asses, swine." It was admitted by counsel, on the argument, that the word "cattle" included oxen, and that a literal interpretation of the statute would give to a plaintiff, suing within six months after the killing of cattle by a train, the benefit of a presumption, whether it should appear that the animals were running at large or attached to a wagon. But it was insisted that it was the right and duty of this Court to go behind the plain letter of the law, and endeavor to find out the evil that was intended to be remedied by the statute, and, in that way, to ascertain and effectuate what we may conceive to have been the true purpose of the Legislature in passing the law. It is conceded that the leading object to be kept in view by Courts in construing acts passed by the Legislature, is to determine what was the true intent of the General Assembly and to give effect to it. There are, however, certain familiar rules prescribed for the government of Courts in interpreting their meaning, one of which is, that where the language of the

statute is not ambiguous, and its literal import is not doubtful, the Courts are not allowed to consider extraneous reasons, or to resort to the preamble of the act, even, in order to give to its words any other than their technical meaning, if they have such signification, or their ordinary meaning, if they have no legal signification   *Adams* v. *Turrentine*, 8 Ired., 147; *Blue* v. *McDuffie*, Busb., 131.

The powers of the co-ordinate branches of the government being required by the Declaration of Rights (Cons., Art. 1, § 8) "to be forever separate and distinct," it is far more important here than it is in England, where Parliament is omnipotent, that the Courts should observe and rigidly adhere to this established rule of construction, because it alone presents a barrier to the assumption by the highest judicial tribunals of the right to give to legislative acts, however clear and unmistakable their phraseology, what the Courts think ought to have been, rather than what really was, the meaning of the law-makers. The presumption is that the persons selected to represent the people in the Legislature understand the import of the language used by them, and their purposes, when clearly expressed, must be carried out to the letter, if we can give no better reason than that it will occasion what the Courts consider hardship or inconvenience to some person or corporation to do so.

Sedgwick, in his work on Statutory and Constitutional Law, p 310, quotes with approval the following forcible expression of the principle in the opinion of the Circuit Court of the United States in *Priestman* v. *United States*, 4 Dallas, 30: "By the rules which are laid down in England for the construction of statutes, and the latitude which has been indulged in their application, the British Judges have assumed a legislative power, and on *pretence of judicial exposition* have, in fact, made a great portion of the statute law of the kingdom. Of those rules of construction, none can

be more dangerous than that which, distinguishing between the intent and the words of the Legislature, declares that a case not within the meaning of a statute, according to the opinion of the Judges, shall not be embraced within its operation, although it is clearly within the words, or *vice versa.* We should invariably deem it our duty to defer to the expression of the Legislature, *to the letter of the statute, when free from ambiguity and doubt,* without indulging in speculation, either upon the impropriety or hardship of laws." The author (Sedgwick), then adds: "Indeed, the idea that the Judges, in administering the *written law,* can mould it and work it according to their notions, not of what the legislator said, not even of what he meant—in other words, according to their own ideas of policy, wisdom or experience—it is so obviously untenable that it is quite apparent it never could have taken rise, except at a time when the division lines between the great powers of the government were but feebly drawn and their importance very imperfectly understood. In the present condition of our political system, this practice *cannot be acted on with either propriety or safety.*"

In *Putnam* v *Langley,* 11 Pickering, Chief Justice SHAW says: "The argument of inconvenience may have considerable weight upon a question of construction *where the language is doubtful;* it is not to be presumed upon doubtful language, that the Legislature intended to establish a rule of action that might be attended with inconvenience. But where the *language is clear,* and *where of course the intent is manifest, the Court is not at liberty* to be *governed by consideration of inconvenience.*"

"Arguments drawn from impolicy or inconvenience," says Mr. Justice STORY, "ought to have little weight. The only sound principle is to declare *ita lex scripta* to follow and to obey; nor if a principle so just could be overlooked, could there be well found a more unsafe guide or

practice than mere policy and convenience." Conflict of Laws, 17; *Smith* v. *Rues*, 2 Som., 355; 1 Dillon. Mun. Corp., sec. 311; Cooley's Const. Lim., 186, 187.

The principle that is so clearly expressed by the distinguished Judges and authors already mentioned, has been repeatedly sanctioned by the adjudications of this Court. In *Blue* v. *McDuffie, supra,* the Court held that where the words of a statute are vague and the meaning uncertain, the preamble or even the caption may be called in aid for the purpose of construction, but that neither could control the construction where the meaning was expressed with certainty. *Adams* v. *Turrentine, supra.* In *State* v. *Eaves,* 106 N. C., 752, the principle was laid down that, where the language of the Legislature is clear, the Courts will not look into the motive or purpose of the Legislature in the enactment of the law. Justice MERRIMON, delivering the opinion in *Brown* v. *Brown,* 103 N. C., 213, says: " What is called the policy of the Legislature, in respect to particular enactments, is too uncertain a ground upon which to found the judgment of the Court in the interpretation of statutes, especially when they are clear, unequivocal and absolute in their terms and expressed purpose."

In the face of these full and unequivocal reiterations of this important rule of construction, by this as well as other Courts of the country, counsel contend that we ought to look behind the language, which they admit is not vague or uncertain, and try to ·determine, from` a consideration of matters entirely extraneous, what motives induced our legislators to enact the statute. The interpretation insisted upon would involve, in effect, the interpolation, after the words " other live stock," in the statute, of the words " while straying at large, but not while being driven, either attached to a vehicle or without the restraint of bridle or harness, or when being transported on trains"; and the argument offered to sustain the correctness of such a latitudinarian construction

is, that a literal construction may lead to inconvenience and absurdity, and that, in this case, it would be "absurd" to suppose that the Legislature intended to make the fact of killing in the presence of the owner or his servant *prima facie* evidence of negligence. The familiar instance given by Blackstone of the physician who bled a man who had fallen down in the street from a fit, in violation of a law that imposed a severe penalty for shedding blood in the streets, was referred to as authority. It is true, also, that the same principle was invoked in *State* v. *Wray,* 72 N. C., 253 (which case this Court, in *State* v. *McBrayer,* 98 N. C., 619, declared went to the extreme limit); but, in both cases, the violator of the letter of law was justified only on the ground that a human being was thereby saved from death or peril, or relieved from great suffering. Lord Coke stated the principle to be, that "acts of Parliament are to be so construed as no man that is innocent and free from injury or wrong be, by a literal construction, *punished* or *endangered.*" Inst , 24 b. But we cannot see how a literal construction of a statute that merely shifts the burden of proof, where the question involved is the liability of a corporation to pay for cattle, can give rise to a great necessity, like the peril of human life, that will justify the disregard of the letter of the law.

The two supposititious cases that were submitted by counsel clearly come within the letter of the law. If the plaintiff's oxen had been killed while being transported in one of defendant's cars, or while he was driving them, without bridle or harness, across the track, it would not have been absurd to adhere to the letter of the law, and hold, that upon an issue as to negligence, the defendant would start out with the laboring oar. The Legislature had unquestionably the power to enact the law, as it did, in broad enough terms to cover both cases, and the exercise of a constitutional right by a co-ordinate branch of the government

107—48

could not be adjudged by us to be absurd. Besides, the Supreme Court of the United States has declared that the Courts would be going too far in making, by construction, exceptions which the Legislature had not made. *McIver* v. *Reagan*, 2 Wheaton, 25. In a case somewhat like that of *State* v. *Dalton*, 101 N. C., 680, Chief Justice SHAW said: "The Legislature has made no exceptions. If the law is more restricted in its present form than the Legislature intended, it must be regulated by legislative action." *Commissioners* v. *Kimball*, 24 Pick., 370 See also *Alexander* v. *Worthington*, 5 Md., 472; Dwarris, 597.

The rule adopted by the Courts in England, and invoked by counsel here, was stated by PARKE, B. (in *Jones* v. *Harrison*, 6 Ex., 332), to be, that the Court should "take the words in their ordinary grammatical sense, unless such a construction would be obviously repugnant to the intention of the framers of the instrument *to be collected from its terms*, or would lead to some absurd or inconvenient consequence." Though, as we have seen, no such liberal rule has been adopted by this Court, or generally in this country, still, according to that authority, the meaning of the law must be gathered from its terms, giving to the words their ordinary sense, unless such construction would lead to absurdity or inconvenience.

In the face of such a current of authority prohibiting us from looking behind the plain language of the law and instituting search and inquiry to ascertain what was the purpose in the minds of the law-makers when it was passed, we cannot be expected, because the late Chief Justice *arguendo*, in *Doggett* v. *Railroad*, 81 N. C., 459, said, substantially, the owner of cattle was placed at a disadvantage, if they were killed by a train while straying at large, no witnesses being present except the employees of the railroad company, and that was a sufficient reason for enacting the statute. If it had been declared, *obiter*, that such was the actual reason

moving the law-makers in passing it, the question there was whether the presumption was rebutted, and such a suggestion, by way of argument, would not constitute sufficient authority for violating an important principle, and furnishing an entering wedge that might be used hereafter to justify the assumption by this Court of the power to amend, modify or annul laws, because, in the opinion of the Judges, the construction of the language, according to its usual import, would lead to absurd consequences, or subject some person or corporation to hardship or inconvenience.

Counsel rested their case entirely upon the construction of the statute, and we deem it unnecessary to add anything to what was said in the opinion of the Court on the former hearing (104 N. C., 410) in response to the question whether there was evidence to go to the jury tending to show negligence, and especially in view of the fact that there was no disagreement among the members of the Court upon this question. There is no error. The petition is dismissed.

CLARK, J. (concurring): While the letter of the statute must be construed by the spirit, the spirit must be gathered from the act itself. *State* v. *Eaves*, 106 N. C., 752, and cases there cited. Hence, it would seem that the historical incidents cited in the argument do not apply, for in each of those cases the context plainly indicated the meaning of the phrases, which were ingeniously construed (or fictitiously supposed to have been construed) in an entirely different sense.

A human being is endowed with intelligence, and hence, when he is struck while on a railroad track, he may well be presumed to have been negligent, but no reason for such rule exists as to dumb brutes. *Snowden* v. *Railroad*, 95 N. C., 93; *Carlton* v. *Railroad*, 104 N. C., 365. The act of the Legislature, therefore, as to "live stock" has placed the presumption of negligence upon the rational intelligence which

guided, and which might have restrained, perhaps, the instrument of destruction, and has not imputed negligence to the irrational victim who suffered. If the owner delays action for six months the presumption ceases, for in the lapse of time the company may cease to have in its employ the witnesses who might have rebutted the presumption. The words of the act are so plain that it would be "judicial legislation" to place a construction upon them other than the import of the words, in their ordinary sense, would justify. Any amendment or restriction of the nature suggested by the defendant would properly come from the Legislature, and not from the Court.

When it appeared by the admission of the defendant that the oxen had been killed within six months before suit brought by its engine running on its road, the statute raised the presumption of negligence. Had nothing else appeared, the plaintiff would have been entitled of course to a verdict. Had it been further shown that the oxen were hitched up and driven by their owner on defendant's track and were there killed, this would have been evidence of contributory negligence on the part of the plaintiff, which, if unexplained, would relieve the defendant from liability. But because the act of the owner, or teamster, in driving his animals on the track may be contributory negligence, the Courts are not authorized to hold that the statute throwing the presumption of negligence for the killing of live stock upon the railroad company shall not apply to cases in which it may be contended that the plaintiff was guilty of contributory negligence. Under the recent statute it is the duty of the defendant to allege and prove the contributory negligence. Chapter 33, Acts 1887.

In the supposed case stated, of a man riding his horse upon the track, the man has not the right-of-way and knows he has not, hence the presumption of negligence is against him, but as to the horse—while the conduct of the rider would

be evidence of contributory negligence, it does not therefore justify a "judicial" amendment of an unambiguous statute. The argument is, that the oxen being yoked to the wagon they were under the control of the driver, and hence, if they were killed in attempting in their terror and fright to escape there was no presumption of negligence on the part of the company. Anyone who has ever driven two yoke of oxen to a cart knows that when the engine with its glaring head-light suddenly emerged from the darkness round the curve in a few yards of them, and with the noise and rattle of a long train bore apparently straight down upon them, the oxen had not sufficient intelligence to stand steady and let the alarming apparition harmlessly graze by them and pass on. According to their nature they attempted flight, and in turning in the narrow pass some of them got upon the track and were killed. No driver, however intelligent, could have controlled them. At that moment they were no more under his control than if they had not been yoked to the wagon at all. Unless, therefore, the driver was guilty of contributory negligence in driving his oxen along the public road at that place at that time, there was nothing in the "situation" that could in justice (if the Courts had the power), construe the statute as not applicable "because the oxen were under his control." The only person who could then have averted the catastrophe was he whose hand was, or should have been, upon the throttle-valve of the engine. If after turning the curve, it was too late. even for him to prevent the killing, it was due to his own negligence. He knew that at that point the public road ran by the side of the railroad track, and that on the other side of the public road rose the steep shoulder of the mountain so that a horse or oxen attempting flight would in turning come upon the track. The train was out of time. It could not be expected that all travel on the public road would be indefinitely suspended. The plaintiff did

not drive his team upon the railroad track, but was driving along the public road. Had the whistle been blown in proper time the plaintiff would have been warned not to enter upon that part of the road and risk his own life as well as that of his oxen. In the absence of such signal he was justified in proceeding along the road. That the oxen were frightened, and in attempting flight got upon the track and were killed, is due to the ˙recklessness of the engineer, upon the facts as the jury found them to be. There seems no hardship in the application of the statute in this case, even could the Court consider that in construing the meaning of the unambiguous words used.

MERRIMON, C. J. (dissenting): For the reasons stated by me in my dissenting opinion (104 N. C., 410), and others that I might state, I dissent from the order dismissing the petition in this case.

SHEPHERD, J. (dissenting): It sometimes occurs in the administration of justice, that a case is presented which, though in itself of but trifling moment, involves the enunciation of a principle of such great importance that the mind of the Judge may well be impressed with the consciousness that, in passing upon the particular question in controversy, a precedent is being established so comprehensive in its character and of such general application as to materially influence the ruling of the Court in future cases in which interests of far greater magnitude may be concerned.

It is under this sense of responsibility that I feel constrained to express my dissent from the decision of the Court in the present case.. No one, I trust, is more thoroughly convinced than the writer that the duty of the Judge is *jus dicere non dare*, and no one more heartily concurs with the great authors and jurists mentioned in the opinion in con-

demning as "judicial legislation" that latitudinarianism in the construction of statutes which results in an undue extension or restriction of their plain and unmistakable terms.

It is believed, however, that the repetition of these general expressions of disapproval of such a practice (in which it is to be hoped all judicial minds concur) can afford us no aid in determining whether a particular construction of certain words or phrases falls within their condemnation, since its correctness or incorrectness is the *very point* to be decided. They can, therefore, only legitimately serve as admonitions to the Courts when exercising so grave and delicate a duty as interpreting the legislative will.

All will agree that, where a statute is expressed in clear and precise terms and is susceptible of but *one meaning*, the Courts are not at liberty "to go elsewhere in search of conjectures in order to restrain or extinguish it" (Potter's Dwarris, 143); neither are they at liberty (quotes Sedgwick, 310) to depart from the letter of the statute "*when free from ambiguity and doubt.*" But I have been unable to find any authority in support of the idea that this freedom from ambiguity and doubt is to be ascertained alone from the strict *letter* of a part of the statute; for, if such were the case, the qualifying words of the rule, as above stated, and universally recognized and acted upon, would be meaningless, and the principle of construction would be simply that of *literal* comprehension or exclusion. If the latter be the rule, it would amount to an abdication of one of the most important functions of the judiciary at the feet of the lexicographer, and the noble science of judicial interpretation as developed and illustrated by Vattel, Leiber, Domat, Sedgwick, Dwarris, Potter and other eminent writers would no longer find a place in our jurisprudence.

That such cannot be the proper rule is manifest from the injustice and absurdities that would follow, and these may be illustrated by reference to some of the examples to be

found in the books. The surgeon "who opened the vein of a person that fell down in the street with a fit" was held not to be within the law which enacted "that whoever drew blood in the streets should be punished with the utmost severity" (1 Black. Com., 61), and this was not because he thereby saved a man's life, but because the law did not "extend" to him. So the law of Edward III, which forbade all ecclesiastical persons from purchasing *provisions at Rome,* was considered not to extend to the purchase of "grain or other victuals," because "the statute was made to repress the usurpations of the Papal See, and that the nominations to benefices by the Pope were called *provisions.*" 1 Black. Com., *supra.*

As illustrative of the principle of literal exclusion or restriction, reference may be made to Mohammed, "the emperor of the Turks," at the taking of Negropont, where he promised a man to spare his head, but caused him to be cut in two through the middle of the body. So when Tamerlane promised upon the surrender of a city that no blood should be shed, he considered that he had not violated the terms of the treaty by causing all of the garrison to be buried alive. Vattel Liv., ch. 11, 17.

It would seem hardly necessary to resort to such illustrations to demonstrate the utter impracticability and injustice of literal interpretation, and I have only done so because it seems to have had a controlling influence in the decision of this case.

So far from such a rule finding support in the books it is universally condemned, and this disapproval is fittingly declared in *Eyston* v. *Studd,* Plow., 467, "that a man ought not to rest on the letter only, *nam qui haeret in litera, haeret in cortice,* but he ought to rely upon the sense which is the kernel and the fruit, whereas the letter is but the shell."

It is manifest, therefore, that we are not blindly to follow the letter of the statute because by construction its general

language *may* be made to include every subject of a class under all conditions and circumstances, and it is also clear that the literal interpretation of the legislative will is an unsafe guide in determining whether the language is so free from ambiguity as to shut out all interpretation whatever. "The best rule of interpretation to be adopted by the Courts is to ascertain the meaning of the Legislature from the words used in a statute and the subject matter to which it relates, and to restrain its operation within narrower limits than its words import, if satisfied that the literal meaning would extend it to cases which the Legislature never designed to include." *Brewer* v. *Blonger*, 14 Peters, 178; Potter's Dwarris, 183. "*Scire leges non hoc est verba earum tenere sed vim ac potestatem*, and the reason and intention of the law-giver will control the strict letter of the law, when the latter would lead to palpable injustice, contradiction and absurdity. * * * When the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt and the objects and the remedy in view, and the intention is to be taken or presumed according to what is consonant to reason and good discretion." 1 Kent. Com., 462; Potter's Dwarris, 209, note.

Disregarding, then, the idea that literal comprehension is the test of non-ambiguity, I will now consider whether the language of section 2326 of *The Code* has such "a definite signification in common use, affixed to it by custom," that it necessarily includes within its meaning horses, mules and oxen when hitched to vehicles and under the guidance and control of an intelligent human will. Are the words so *very plain* in the connection in which they are used, that all inquiry into their object, reason and spirit is inhibited, and that we are to abandon the well-settled rules of construction and apply them with an utter disregard of the absurdities and incongruities to which their literal interpre-

tation may lead? This, it seems to me, would be doing injustice to the Legislature, whose will we are all so anxious to interpret and execute. The language under consideration is to be found in chapter 9 of *The Code*. This chapter is entitled "Cattle and other live stock," and contains various provisions such as to the branding of cattle, driving the same in certain seasons from other States into this State and from one part of the State to another; prohibiting distempered cattle from going at large and other general regulations, no one of which in the slightest degree relating to such animals when hitched to vehicles or otherwise in actual use. The general scope and meaning of the entire chapter excludes this idea, and the fact that we find the language under construction so associated reflects, it seems to me, a strong light upon the true sense in which it is employed. *Noscitur a sociis.*

Again, in all the works on railroads and negligence it will be found that the words "cattle and live stock" are exclusively used as applicable to animals straying on the road-bed, and not under the direction and control of the owner. Take for example, Wood's Railway Law, vol. 3, ch. 28, entitled "Injuries to Live Stock," and there cannot be found, either in the text or in the multitude of cases cited in the notes, the least suggestion that the words "live stock" or "cattle" cover such a case as ours. The idea of confounding straying stock with that which is hitched and under the control of an intelligent mind, has never before, I think, been intimated in the law of negligence; and in none of the States where statutes similar to ours have been passed can there be found a case where the law has ever been so construed. All of the law of negligence, statutory or otherwise, as to injuries to live stock seems to relate to stock when straying, and to recognize the important distinction to which I have adverted. It would be a strange anomaly in the law of negligence if, in a suit for the killing of a horse and its

rider, the burden of proof should be in favor of the former and against the latter. The same rule, under the construction contended for, would apply to the case of a live pig which is being carried to market on the shoulder of its owner. In a *single* action for the recovery of damages for injuries to both, occasioned by the *same accident*, we would have two different rules as to the *onus probandi*, with the advantage most decidedly on the side of the pig, thus constituting in the history of this species of the animal kingdom the single exception to its exclusion from all favorable consideration whatever, as indicated by its proverbial dependence upon its own peculiar exertions for a livelihood.

Another objection is that under such a rule a person might purposely drive his horse on a railroad track and have him killed, and then insist that the presumption of negligence arose, and that it devolved upon the railroad to rebut it.

Again, it cannot, I think, be reasonably insisted that animals in the actual use of the owner are generally spoken of as "cattle" or "live stock." "Words are only designed to express the thoughts; thus, the true signification of an expression in *common use* is the true idea which custom has affixed to that expression." Potter's Dwarris, 127.

When one is driving his horse, or a lady is riding her pony, is it customary to say that the man is driving one of his "cattle," or that the lady is riding one of her "live stock"; and is this the "expression" which "custom has affixed," and which we commonly use in such instances? The mere statement of the question, it seems to me, furnishes its own answer.

These considerations induce me to believe that the words under examination do not apply to cases like the present. Certainly their meaning is not so "explicit" as to shut out all inquiry into the reason and spirit of the law. As I have said, "the most universal and effectual way of discovering the true meaning of a law, when the words

are dubious, is by considering the *reason* and *spirit* of it, or *the cause which moved the Legislature to enact it.*" Black., vol. 1, 61. Acting upon this well established principle, this Court has unequivocally declared the true spirit of the statute and the defects which it was intended to remedy. The late Chief Justice, in *Doggett* v. *Railroad,* 81 N. C., 459, in giving the history and reason of the statute, said, "where injury to stock *straying off* is done by trains running at night as well as by day, and *known only to defendant's employees,* it was almost an impossible requirement" that the plaintiff should prove the negligence as a part of his case. "The owner would not know how, when or by whom the injury was done, while the servants of the road would possess full knowledge of the facts. *Hence,* the General Assembly enacted section 2326 of *The Code,* \* \* \* thus shifting the burden of proof from the plaintiff to the defendant, and requiring the latter to show the circumstances, and repel the legal presumption." In *Durham* v. *Railroad,* 82 N. C., 354, the Court, further sustaining the same view, remarked: "The responsibility of railroad companies for injuries to stock *straying upon their tracks,* and the care and diligence required in the management of running trains, have frequently been before the Court, and were fully discussed in *Doggett* v. *Railroad,* 81 N. C., 459." It seems to me that this clear and emphatic construction of the law, sustained as it is by reason and the current of authority, should not be disturbed. This construction gives full effect to all of the purposes which the Legislature had in view, and I am opposed, by what I consider a strained interpretation of the statute, to go beyond these purposes and introduce anomalies which were never even remotely contemplated by the law-makers. To "cavil about the words in subversion of the plain intent of the parties is a malice against justice and the nurse of injustice." Plowd., 161. "Construction must be made in suppression of the mischief and in advancement of the remedy." Cook Lit., 381, 386.

Says DILLARD, J., in *Burgwyn* v. *Whitfield*, 81 N. C., 265: "In construing a statute, it is laid down as a rule by which Courts ought to be guided, to look at the words and construe them in the ordinary sense, if such construction would not lead to absurdity or manifest injustice, but if it would, then they ought to vary and modify the words so used, so as to avoid that which it certainly could not have been the intention of the Legislature should be done." Broom's Leg. Maxima, 552.

The particular point under discussion in this case arises upon the instruction of the Court (the defendant having asked a contrary instruction), that, "it being admitted that defendant's engine killed the cattle, and the suit having been brought within six months, the statute raised a presumption of negligence, and the burden was on the defendant to rebut the statutory presumption." It will be noted that the *plaintiff's testimony* showed that the animals injured were *hitched to a wagon and being driven by the plaintiff, and there was no dispute whatever as to these facts.*

In view of the well-established rules of construction, most pointedly illustrated by the foregoing facts, I am well satisfied that we were in error in holding that the foregoing instruction was correct. It is because of what I conceive to be an erroneous statement and application of these most important general rules that I have thought proper to state my views at such length.

I think that the petition to rehear should be granted.

*Per Curiam.*                    Petition dismissed.