* CLARK, J., did not sit on the hearing of this appeal.
The jury rendered the following special verdict:
"1. That Augustus Davis was one of the children of Thomas Davis, and from him inherited about 200 acres of land in Franklin County, North Carolina, and this was all the land he ever owned in said county, either by inheritance or otherwise. This land was set apart to the said Augustus Davis in a regular partition proceeding, begun after the death of said Thomas Davis, in Franklin County, for the purpose of dividing his land among his heirs at law.
"2. That the said Augustus Davis, some time prior to 1873, removed to Texas; while there, letters passed between him and his sister, Temperance Alston, nee Davis, who is the propounder of the paper-writing offered to probate.
"3. On 28 February, 1873, the said Augustus Davis wrote to the said Temperance Alston the letter which is offered to probate, and which appears at length as `Exhibit A' in the transcript made by the clerk below and sent up to this Court. *Page 126 
"4. That said letter was posted at Stockdale P. O., Guadaloupe County, Texas, and by the United States mail was transmitted (204) in the usual course to the said Temperance Alston, and by her in due time received, since which time she has carefully preserved it.
"5. That the letter and every part of the same, and the signature, are all in the handwriting of Augustus Davis.
"6. That Augustus Davis has not been heard from in more than seven years and has been continually absent since his first departure. When last heard from, he was in Texas. We therefore find the fact to be that the said Augustus Davis died in Texas.
"7. That the following are the heirs at law of the said Augustus Davis, viz., Temperance Alston, who is sister of the whole blood; Frank Davis, John Davis, Nicholas Davis, brothers of the half blood; Betty Mordecai, daughter of a deceased sister of the whole blood; Pattie Boyd, Annie Boyd and Willie Boyd, infant children of a deceased sister of the half blood, who are all parties to this action.
"8. That the said Augustus Davis had no other property of any sort, either in North Carolina or elsewhere.
"Upon this statement of facts so found, if the court shall be of the opinion that the letter of date 28 February, 1873, which was offered for probate, is the last will and testament of Augustus Davis, we do for our verdict so find. If the court shall be of a contrary opinion, we find the contrary."
The letter referred to in the special verdict is as follows:
 "STOCKDALE P. O., GUADALOUPE COUNTY, TEXAS, 28 February, 1873.
"MY DEAR SISTER: — With great pleasure I seat myself to answer your most welcome letter, which reached me over a week ago. It had been over a month since I had heard a word from you, so you can imagine that I was more than glad to hear from you, for in (205) truth I was, and I guess you are getting anxious to hear from me, for I think it has been something like a month since I wrote you last. I would have written ere this, but our mails have been completely stopped by the epizootic with our horses — completely disabled the stages to move — and we are entirely dependent on them for our mails. I think they are traveling again regularly. Not withstanding it has been so long since I wrote you, I don't know that I can write you anything interesting, yet I know it will please you to hear from me. I wrote you in my last letter that I did not buy the land which I was talking of buying. I could have raised the money to pay for it, but I came to the conclusion that it was too much for it, and I would *Page 127 
have had to borrow two or three hundred dollars to have made the first payment and paid interest on it, besides paying interest on the balance that was due on the land. I am living with Mr. James McDonald, the same man that I lived with last year; have about eighty acres of land rented from him. I pay him one-third of the corn and one-fourth the cotton that I raise for the rent. I have all the expenses to pay toward the crop. I have the use of his gin, free of charge, to gin the cotton which I raise. I board with him, paying him $10 per month. The family are very kind to me, and my fare is as good as the country affords. I have a nice room to sleep in; two of Mr. McDonald's sons, twelve and fourteen years old, and a man whom he has hired, stay in the room with me. I have acess [access] to plenty of good books, but don't have time to read much. I have two men hired to help me with my crop, both negroes. I pay them $17 per month; they find their own provisions. Mr. McDonald has a son, about my age, who is having the balance of his plantation cultivated. He has been in the mercantile business at Sutherland Springs some time, but had to quit on account of his health. He was very anxious for me to take the (206) whole of his pa's place this year, but labor is so uncertain in this county I did not care to be bothered with it. I had the entire farm under my charge last year, and found it very difficult to get labor, but I made the best crop that has been made on the place since the war. I cleared about $800 last year off my crop, but had $400 old store accounts to pay, which I contracted while in the mercantile business at Nockenout. I have about $500 due me, which was let out while in that business. We have had a beautiful year, so far. Planters in this country are further advanced in their crop than I ever knew them this season of the year, and are making larger preparations for a crop than they ever have since I have been in the county. I have all my crop planted, about twenty acres; expect to get through breaking up all my land for cotton next week; will commence to plant cotton as soon as I get through breaking up. I am staying at home very close and working very hard this year; hope I will be able to come and see you when I get through with crop; but I have been talking so long about coming to see you that I know you will never pay any attention to what I say about it. If you know of any young ladies that are waiting for me, tell them not to pine for my long absence. I say `ladies' because I know there are lots of pretty ones around you, and, like the cattle and horses, very wild and hard to catch. I wish you and the young lady you spoke of would fix me up a box and send; I would pay double the expense on it just for the sake of getting something from home. I know it would make me homesick, but I would not care for that, for I think it would help me in the end, but don't *Page 128 
think that you could safely send it so that I could get it in time. I hope you will get fixed on your place this year all right. I am (207) sorry you will have to sell your land that you got from our father's estate to make the payments. I don't think I will ever sell mine. When I get old I am going to build on it so I can have it as a home when I get old. If I should die or get killed in Texas the place must belong to you, and I would not want you to sell it. I don't care about tenants put on it; I am afraid they will destroy the timber on it. If I could walk over the tract and pick out a place that suited me to build I would not mind allowing a good tenant to build and open a small field on the tract, and I am willing for you to pick out a pretty place to build on for me. So if you see a good tenant that will build a house and open a small field on the tract I will get you to make the best arrangements with him that you can for me, and you can get Brother John to take you over there, so you can pick out the spot to build on. Any place that you pick out will suit me. If you collect any money of mine keep it until I call on you for it, and try and collect all you can for me. My sweet sister, I don't want you to trouble yourself or to allow these little trifles of mine that I speak to you about to bother you in the least; I merely mention them that you may know how to act in case you should feel like attending to them for me or should have a convenient opportunity. I don't get any letters at all from North Carolina, except from you. I used to have several correspondents back there, but it has been so long since I have had a letter or written to them that I don't know who owes, they or I. Give my best love to Brother John and all the family, especially to Cousin Rini. How is ma and the children getting on? I am going to write to Mollie and Frank soon. Do you get letters from...........? Give her my best love. I am going to write to her soon. I believe (208) I have written you all the news, and the mail boy is hurrying me; so I must close. I will write again soon. So, with a prayer to God to take care of you, I bid you good-bye. I am, as ever, your devoted brother,
AUGUSTUS DAVIS."
The court, upon the verdict, being of opinion that no part of the letter was the will of Augustus Davis, gave judgment accordingly, and the propounders appealed.
In response to the issue of devisavit vel non the jury returned a special verdict, upon which the court below rendered the judgment appealed from. The two elements of every will — that is, operative to transmit property — are that it shall disclose the intention of the maker concerning the disposition of his property after his death, and that it shall be executed and attested according to the requirements of law. No particular from is prescribed or is necessary. However inartificial the language in which it is expressed, and even where the apt legal words which ordinarily characterize a deed or power of attorney may not be used in it, if upon an examination of the whole instrument it appears that it was the purpose of the maker to give expression to his wishes as to the disposition of the whole or any portion of his property, to take effect after his death, it will be regarded as a will, unless the statutory requisites as to execution and attestation have been disregarded. Woemer Am. Law A., sec. 38, p. 60; Cross v. Cross, A. E., 8 (C. L. R.), 714; Byers v. Hoppe,51 Md. 206; In the Goods of W. Coles, 2 Court of Probate and Divorce, 362. The paper-writing is a letter offered for probate as a holograph will, the material portion of which is as follows:
"I hope you will get fixed on your place this year all (209) right. I am sorry you will have to sell your land that you got from our father's estate to make the payments. I don't think I will ever sell mine. When I get old I am going to build on it, so I can have it as a home when I get old. If I should die or get killed in Texas the place must belong to you, and I would not want you to sell it. I don't care about tenants put on it; I am afraid they will destroy the timber on it. If I could walk over the tract and pick out a place that suited me to build I would not mind allowing a good tenant to build and open a small field on the tract, and I am willing for you to pick out a pretty place to build on for me. So if you see a good tenant that will build a house and open a small field on the tract I will get you to make the best arrangements with him that you can for me, and you can get Brother John to take you over there, so you can pick out the spot to build on. Any place that you pick out will suit me. If you collect any money of mine, keep it until I call on you for it, and try and collect all you can for me. My sweet sister, I don't want you to trouble yourself or to allow these little trifles of mine that I speak to you about to bother you in the least; I merely mention them that you may know how to act in case you should feel like attending to them for me or should have a convenient opportunity. I don't get any letters at all from North Carolina, except from you. I used to have several correspondents back there, but it has been so *Page 130 
long since I have had a letter or written to them that I don't know who owes, they or I."
The statutory requirement as to them execution and attestation of a holograph will, or so much thereof as is pertinent to the question here presented, is that it shall "be found among the valuable papers and effects of any deceased person, or shall have been lodged (210) in the hands of any person for safe-keeping, and the same shall be in the handwriting of such deceased person, with his name subscribed thereto or inserted in some part of such will." The jury will find that every part of this letter is, as the required number of witnesses testified, in the handwriting of Augustus Davis. The letter from which the foregoing extract is taken was mailed at Stockdale, Texas, and purported to have been dated 28 February, 1873, and received in due course of mail. The jury found as a presumption, arising from the fact that Augustus Davis had not been heard from in seven years, that he was dead.
There is no safer rule for the interpretation of a statute, where a controversy arises as to the meaning of its language, in applying a general principle embodied in it to a particular state of facts, than to look to the reason which prompted its enactment. If the meaning of the words used in the statute were unmistakable, there is no ground for further dispute, because they must be interpreted according to their obvious meaning.Randall v. R. R., 104 N.C. 410.
But the question whether a paper-writing has been lodged in the hands of another for safe-keeping is one that must be answered, when the paper has been in fact sent or given to another person by the maker, after a careful review of all of the attendant circumstances, and after considering them in connection with the writing, in order to determine what inferences may be fairly drawn from the words and conduct of the writer as to his purpose in sending or giving the writing. The requirement of the statute is founded upon the idea that a decedent's estate should not be deemed to have been disposed of by any careless expression used by him in a letter, unless there was something to indicate that he intended the writing not merely to subserve the purpose of expressing his present wishes, which might (211) change, but that he intended to state how he desired to dispose of a part or the whole of his property after his death. Where a testator puts away a paper among his valuable papers, or gives it to another for safe-keeping, it is evidence that he wishes it preserved, in order that it may serve the purpose after his death for which it purports to have been written. It is not essential that the maker of the instrument should use any particular words, such as "I lodge this paper with you for safe-keeping, as the law requires I *Page 131 
should do." No such rigid rule was intended to be applied in the interpretation of the statute giving the privilege to one, inopsconsilii, and remote from those he loves, of providing for them, when the thought of their dependent condition comes up before him, even on a farm in the backwoods. Does the letter show upon its face that the writer was thinking of the contingency of his death while in Texas? Does it plainly express the disposition he wished made of the land if the contingency happened? The answer to these inquiries is in the words of the letter: "If I should die or get killed in Texas, the place must belong to you, and I would not want you to sell it." In determining whether the letter was given to her for safe-keeping, it must be remembered that it shows she was charged with the duty of collecting what was due to him, and was presumably the custodian of any valuable papers left behind him. The law does not require men situated as Augustus Davis was to go through needless forms. He wrote her a letter expressive of his intention that she should have his land, and took pains in that connection, as if he thought it possible that she might assert her rights under the letter, to add that when she should come into the inheritance he would prefer that she should not sell the land. It would seem to be sticking in the bark to allow the devise to fail because he took it for granted that she would lodge in some safe place without a special request (212) to do so a letter which might become so valuable to her. If he had written this expression of his wishes as to a devise to her to a stranger, without requesting him to preserve the letter, a different question would have been presented. But the law is founded upon reason and common sense, and therefore warrants the inference of an intent to leave with a person for safe-keeping a paper in the preservation of which the person entrusted with its custody is above all others most interested. Why add to the statement that the place must belong to her, upon his dying in Texas, the injunction to keep the letter safely?
In Cross v. Cross, supra, the facts were that P., being in India, executed an instrument, attested by two witnesses, in the first part of which he constituted E. his attorney to collect notes, etc., but the latter part of the instrument is as follows: "And I do empower her, the said E., to hold and retain all proceeds of said property for her own use until I may return to England and claim possession in person, or, in the event of my death, I do hereby in my name assign and deliver to the said E. the sole claim to the before-mentioned property, to be held by her during her life, and disposed of by her as she may deem proper at the time of her death. At the same time I wish it to be understood that I claim all right and title to *Page 132 
said property on my arrival in Great Britain, when the term of E.'s occupancy shall be considered at an end." True, that paper was attested by the requisite number of witnesses to make a good devise, but the language is reproduced to show that substantially the same idea as that expressed in the letter was upheld as a testamentary disposition of property. In both instruments there is a clear declaration of a desire and purpose that, in case the maker should not return to his old home by reason of dying at his later place of abode, (213) his property should go to the person, in one instance, named in the power of attorney, and, in the other, in the letter addressed to her. Neither purports upon its face to be a devise, except in so far as the particular words used in it to convey a wish show it to be in law a devise or a disposition to take effect after death. Language about equivalent is used in letters in several of the other cases cited supra, and, though in some of them the suggestion that the letter be preserved is added, they nevertheless establish the principle that such language is evidence of the intent to make a disposition of proprty [property]. If that purpose is unmistakably shown, it is clearly a reasonable inference that a letter transmitted by mail to one deeply interested in preserving it is sent by the writer for safe-keeping. He had better reason for believing that she would take care of it without such caution than that another who had no interest in the result would keep it safely with an express request to do so. The statute is but an affirmance of the elementary principle that it is reasonable to suppose that a testator will manifest the wish to have his will safely kept, when it does not upon its face purport to be a formal devise, but that purpose can be accomplished as readily by finding a custodian whose interest it is to preserve it as by confining it to the care of a disinterested keeper and relying on his observance of the most solemn injunction to keep it safely.
The case of St. John's Lodge v. Callender, 26 N.C. 335, is not analogous, because the writing propounded there was found, not amongst the papers of the maker, but amongst those of his partner, who meantime had died, and there was no testimony offered, except the incompetent declaration of the deceased partner, as to how he acquired the custody. Non constat that the paper had not been thrown (214) into a waste basket by the maker, with intent to destroy it, and picked up by his associate in business. But here it is found as a fact that the writer sent it by mail to his sister, in whose custody it was found, as might have been expected.
The judgment is reversed. Let this opinion be certified, to the end *Page 133 
that judgment may be entered below on the special verdict in favor of the propounders.
Judgment Reversed.