J. W. RANDALL v. THE RICHMOND AND DANVILLE RAILROAD
COMPANY.

*Negligence—Presumption—Statute, Construction of—Railroad—
Injuries to "Live Stock."*

1. The statutory presumption of negligence for killing live stock, when
   the action is brought within six months (*The Code,* § 2326), is not
   rebutted by showing that the live stock were under the control
   of a *person* at the time.
2. The language of the statute is broad enough to include such case as
   well as when the live stock were running at large.
3. The force of the presumption applies only when the facts are not
   known, or when, from the testimony, they are uncertain.
4. It is the duty of a person approaching a railroad track to take every
   prudent precaution to avoid collision; and it is the duty of the
   engineer to blow his whistle or ring his bell at a reasonable dis-
   tance from the crossing, in order to enable travelers to avoid
   danger.
5. In construing statutes, where words having a known technical mean-
   ing are employed by the Legislature, that restricted or specific
   interpretation will be given them, but otherwise they will be inter-
   preted according to their ordinary import; and, where there is no
   ambiguity, and the meaning is clear, not even the preamble or
   caption of the statute will be resorted to for the purpose of con-
   struction.

This is a CIVIL ACTION, tried at July Term, 1889, of the
Superior Court of MADISON County, before *Clark, J.*

The action was brought to recover damages for the negli-
gent killing of three oxen, belonging to plaintiff, by the
defendant's engine, running on the W. N. C. Railroad.

The plaintiff testified that he was traveling on the public
road, returning from a station on defendant's road, between
8 and 9 P. M., in July, 1888, and driving the oxen, yoked up
to a cart.   At one point, about one hundred yards from the
station, and just above a regular crossing of the road, the

public road ran very close to the railroad; that, just above and below this point, the public road diverges further from the railroad track; that the train was out of schedule time, and came down the road, meeting the team of the plaintiff; that, just as plaintiff reached this narrow point where the public road ran close by the side of the railroad, he heard a slight blow from the engine, and, almost immediately, the engine came around a curve on the mountain, sixty or seventy yards off; that the blow was not the ordinary station blow, nor sufficient to give warning, and that, for the regular road crossing close by, no blow was given; that, if the regular station blow, or the crossing blow, had been given, he could have stopped his oxen before he got to the place where the public road ran close by the track; that there was a large pile of wood, behind which he could have stopped; that the blow for the crossing not having been given, in ignorance of the approaching train, he had advanced to the narrow point, where, on one side was the railroad, and on the other the steep side of the mountain. The train suddenly coming around the curve, the noise and blazing headlight so frightened the oxen that, in attempting to get out of the way, three of them got on the track and were killed. Defendant company took charge of the beef and sold the hides. The oxen were worth to him $150, and, on the market, would have sold for $140 to $165. They were killed in July, 1888, and this suit was begun in August of same year.

The engineer testified that he blew the station blow, and as loud as usual, and at the usual place, and, after he had blown it, he felt his engine strike something; that he did not see the oxen at all; that he was at the usual place on the engine, and on the lookout; that, when he stopped at the station, he went back and found that three oxen were killed; that he was driving the engine at the usual speed, and with care, but saw nothing on the track; that he did not blow for the crossing.

The defendant asked the Court to charge—

1. That, as the oxen were not straying, nor at large, but yoked to a cart, and under charge of a driver, the statute raising a presumption of negligence in such cases does not apply.

2. That, if the presumption of negligence did arise, it was rebutted by the plaintiff's own evidence.

3. That there was no evidence to go to the jury; that there being no substantial conflict of the evidence, the Court should, on the evidence, direct a verdict to be entered for the defendant.

The Court declined to so instruct the jury, and charged them, among other things, that, it being admitted that defendant's engineer killed the cattle, and the suit having been brought within six months, the statute raised a presumption of negligence, and the burden was on the defendant to rebut that presumption; that, at crossings, it was the duty of the defendant's engineer to give notice by blowing his whistle, but that, if the station whistle was blown in sufficient time, and loud enough for the plaintiff to have stopped his team before approaching the crossing and the narrow spot leading to it, and the plaintiff did not heed the warning, but pressed on, and his oxen, becoming frightened, got on the track and were killed, the presumption of negligence was rebutted, and the jury should find for the defendant; but, if the station whistle was not blown in due time, and the plaintiff, without warning, drove his oxen to the narrow place, where the engine, coming around the curve, frightened his oxen so that they jumped on the track and were killed; or, if the jury should find that, if the regular whistle for the crossing had been blown, the plaintiff could and would have stopped before getting to the narrow place, where the railroad was on one side and the mountain on the other, then the presumption of negligence would not be rebutted.

Verdict for plaintiff. Motion for new trial, assigning as error the refusal to charge as requested, and the part of the charge above given.

Judgment; appeal.

No counsel for plaintiff.

Mr. F. H. Busbee (Mr. D. Schenck filed a brief), for the defendant.

AVERY, J.—after stating the facts: *The Code*, § 2326, provides that, "when any cattle or other live stock shall be killed by the engines or cars running on any railroad, it shall be *prima facie evidence of negligence* on the part of the company in any action for damages against said company: *Provided*, that no person shall be allowed the benefit of this section unless he shall bring his action within six months after his cause of action shall have accrued."

The Court below was asked to instruct the jury that, when the cattle killed were yoked to a cart, and in charge of a driver, the statute does not apply, and no presumption of negligence arises from the fact of the killing. The charge given in lieu, that the law presumed negligence upon the admitted facts, constitutes the grounds of the first exception.

Where words have a known technical meaning, it must be adopted in construing a statute, but, apart from that, they must be interpreted according to their ordinary import, and, where there is no ambiguity, but the meaning is clear and certain, not even the preamble or the caption of a statute can be called in aid for the purpose of construction. *Adams* v. *Turrentine*, 8 Ired, 147; *Blue* v. *McDuffie*, Busb., 131.

The definition of cattle given by Worcester is "a collective name for domestic quadrupeds, *including the bovine tribe, also horses, asses, mules, sheep, goats and swine,* but especially applied to bulls, *oxen,* cows and their young." Lest the term might be understood in its restricted sense as applying to the bovine

species, the Legislature added the words "other live stock," which is more comprehensive than the generic meaning, but the term "cattle" includes oxen, according to either definition. The Courts must always assume that the Legislature is capable of expressing, and does express, its real intent, according to the ordinary sense of the words, and adopt it in construction when it is clear. Potter's Dwarris, 219; *State* v. *Massey*, 103 N C., 356. If there had been any purpose to limit the operation of the statute to cattle straying without protection and free from control, there was sufficient intelligence among our law-givers to restrict its application, or to except all live stock at the time hitched to a wagon or conveyance, or bridled and controlled by any person. If the Courts now interpolate any such restrictive terms, and thereby change the plain and natural import of the law as it is written, it would be judicial legislation, which is the most dangerous and insidious mode of invading the province of a co-ordinate branch of the State government and usurping its powers, because there can be no redress for such a wrong, carelessly done under the color of the rightful authority to construe statutes, and, in corrupt hands, the manner of encroachment might become a method.

The late Chief Justice, in *Doggett* v. *R. R. Co.*, 81 N. C., 459, enumerated among the benefits of the law the protection it afforded to owners of live stock killed, when there was no witness who knew the circumstances attending it; but that the Court did not intend to limit its application to cattle or live stock straying free from control, and to cases where there were no witnesses to the transaction, appears clearly from the unmistakable language used in stating the final conclusion reached. "The force of the presumption only applies when the facts are not known, or *when, from the testimony, they are uncertain.*"

In the case at bar, the important fact, upon which depended the question of negligence, was in dispute. The plaintiff

testified that the engineer did not give the ordinary station blow at the usual place, while the engineer testified that he did, and, therefore, there was uncertainty about the facts, and the presumption, according to the doctrine laid down in that case, did not lose its "*force.*" His Honor left the jury to determine whether the testimony for the defendant was to be believed rather than that offered for plaintiff as to the question of negligence, and was sufficient to overcome the artificial weight given to proof of the fact of killing by the statute.   After approving, generally, *Doggett* v. *Railroad Co.*, the Court, in *Durham* v. *Railroad Co*, 82 N. C., 354, cite the very words we have already quoted from the former case, showing a purpose to still allow full "force" to the presumption, where the facts are, by reason of conflicting testimony, rendered uncertain.   See also *Roberts* v. *Railroad Co.*, 88 N. C., 560; *Wilson* v. *Railroad Co.*, 90 N. C., 69; *Horner* v. *Railroad Co.*, 100 N. C., 230; *Carlton* v. *Railroad, ante*, p. 365.

The train passed at an unusual hour along a narrow canyon, where the wagon road ran, at some points, close beside defendant's track, and, at others, diverged a little distance from it.  The plaintiff had passed the station and then gone over a crossing, near which the wagon road, for a very short distance, was located in the narrow space between the mountain and the track, when he heard a slight blow from the engine, and, almost immediately, it passed around a curve on the mountain, only sixty or seventy yards ahead of him, and the noise and blazing headlight so frightened the oxen that, in attempting to get out of the way, three of them jumped upon the track and were killed.   This occurred less than six months before the action was brought.

The plaintiff further testified that, if the regular station blow, or the crossing blow, had been given at the usual point, he could have stopped his oxen behind a large pile of wood before he reached the narrow place, and could have saved them, but that, because the blow was not given, he had

advanced to the place where, on the one side was the steep mountain and on the other the track of the railroad company. The engineer testified that he blew *the station blow,* and *as loud as usual,* and *at the usual place.* On the decision of the issue of fact, thus raised, the whole controversy depends. *Troy* v. *Railroad Co.,* 99 N. C., 298.

When a person in charge of a wagon and team approaches a public crossing, it is his duty to look and listen and take every prudent precaution to avoid a collision, even though the approach be made at an hour when no regular train is expected to pass. The same degree of care and caution should be exercised by one who is about to drive into such a narrow and dangerous pass as is described by the witnesses, if he would avoid the responsibility for any injury that may result from his carelessness. But it is the duty of the engineer to blow the whistle or ring the bell at a reasonable distance from such a crossing as was described by the witnesses, in order to give warning to travelers on the ordinary highway running across and near it, and enable them to guard against danger. It is always required of an engineer, if he would relieve the company from liability for negligence, to blow the whistle, as a warning, at a reasonable distance from the crossing of a public highway, or a station, which his train is approaching, and is doubly important where the track winds around curves, between a mountain and river, by the side of a public road; and, if travelers on such highway are subjected to loss by injury to their live stock at a crossing or narrow pass like that described by the witnesses, in consequence of his failure to give such warning as they had a right to expect, the company is liable in damages for such negligence. 2 Wood's R. L., § 323; *Kelly* v. *St. Paul & C. Railroad Co.,* 29 Minn., 1; *L. C. & C. Railroad Co.* v. *Garty,* 79 Ky., 442; *Penn Co.* v. *Krick,* 47 Ind., 368; *Pittsburg & C. Railroad Co.* v. *Jundt,* 3 Am. & En. R. Cases, 502; *Strong* v.

*S. & C. Railroad Co.*, 61 Cal., 326; *Hoar* v. *G. R. & C. Railroad Co.*, 47 Mich., 401; *Troy* v. *Railroad Co.*, *supra.*

We do not see the force of the objection that the oxen were actually injured, not at a crossing, but at a narrow place where the public highway is jammed between the mountain and the railroad track. In all the cases cited, *supra*, the doctrine is laid down (even in the absence of a statute) that it is negligence to omit to give a signal by blowing the whistle or ringing a bell in reasonable time, when a train is approaching a station, and in one of them (*Pittsburg & C. Co.* v. *Jundt*) it was held that a railroad company was liable where, in consequence of failing to have a flagman at a city crossing, as a notice to persons driving along a street parallel with the track that a train was approaching, two horses, being driven by the plaintiff, a female, were met by the train, *just before* reaching the crossing, and frightened so that they ran away and injured her. The failure to have a flagman at the crossing was held evidence of negligence, because the plaintiff had been accustomed to cross there, and naturally expected, and had a right to expect, the usual warning of danger. In our case, the plaintiff knew the usual place for blowing the signal, and testifies that he was misled by the neglect of the engineer to give the signal at that point. Besides, we have forborne to decide whether the same reasons exist for warning travelers driving in ordinary vehicles in sufficient time to allow them to escape from a narrow pass like that described by witnesses that have induced the Courts to hold that, in the exercise of ordinary care, timely notice must be given that a train is nearing a crossing. The importance of giving signals in such cases becomes greater when any peculiar circumstances in a given locality enhance the danger of omitting to do so. *Penn Co.* v. *Krick, supra.*

The case of *Railroad Co.* v. *Feathers*, 10 Lea. (Tenn.) was one in which the Court gave a construction to a statute

104—27

requiring a signal to be given by engineers one-fourth of a mile from crossings, that it was 'enacted especially to prevent injuries· at the crossings. The case at bar rests upon the broader principle and reasoning adopted in *Pittsburg & C. Co.* v. *Jundt:* that some notice must be given of the approach of a train when travelers on the highway are put in jeopardy at crossings, and railroad companies must be held liable for damages for failure to give the usual warning, whereby one aware of the custom is misled so that he subjects himself or his live stock to peril and is damaged in person or property.

The material question is not where the injury was inflicted, but what was its proximate cause, and, if the plaintiff, relying upon the custom of the company to give a particular signal at a certain time, placed himself in a dangerous position and suffered injury, the company is liable for negligence.

The circumstances were such as to suggest caution, both to the plaintiff and the engineer, when the train passed suddenly around a sharp curve along a projecting mountain. We think that the jury have determined, in the manner prescribed by law, which one of them failed to exercise ordinary care. If the plaintiff could have taken refuge behind a woodpile, where the highway had diverged some distance from the track,. and thus have saved his team harmless, but for the failure of the engineer to blow at the usual place, the negligence of the company was the proximate cause of the injury, and the plaintiff was entitled to recover the value of the oxen killed. If he blew the whistle at the usual place, and did not wait till the engine was either sixty or seventy yards of plaintiff, the injury was not due to defendant's negligence. His Honor left the jury to find, from the testimony, what was the truth as to the time of the blowing of the whistle, and thus to settle the controversy.

Affirmed.

MERRIMON, C. J. (dissenting): It seems to me that in this case the Court adheres too strictly to the mere letter of the statute interpreted without adverting sufficiently to its spirit and purpose, and thus reach an erroneous conclusion.   The statute prescribes that "when any cattle or other live stock be killed or injured by the cars running upon a railroad, it shall be *prima facie* evidence of negligence on the part of the company in an action for damages against said company," &c.   It will be observed that its terms, as to the cattle and live stock so killed or injured, are general, without specifying anything as to the circumstances or condition of the stock at the time the injury was done.   Are such terms to be taken in their broadest and literal sense?   Does the statute extend to every such killing?   Does it embrace the case where the owner of stock shall drive his cattle covertly on the road to be killed, to the end he may recover damages on account of the same?   Does it extend to such killing of a horse, or mule, or ox, while the owner was riding or driving the same?   I think not.   The object and purpose of the statute show clearly that it was not intended that it should apply to stock killed, or injured, while bridled, harnessed or yoked, and under the immediate guidance and control of the owner thereof, or some other person.

In an action for damages for such injury to cattle, there being proof of the injury, the statute at once, in effect, declares that it was the result of negligence on the part of the defendant railroad company, unless it can prove there was no negligence on their part.   This it is required to prove negatively.   The statute thus applies only to such stock.   Why is it so limited?   Why was it not made to apply to the like killing of, or injury, to a person?   Why not to injury so done to property of any kind?   These questions are pertinent and significant.   There was a strong, practical reason for so limiting its application.   In this State such stock have generally been allowed to run loose,

unrestrained, day and night, in the fields and forests through which railroads were located. Such roads, in this State, have not been fenced, or otherwise enclosed. Cattle so at large went upon them unrestrained, and were, in many instances, recklessly and negligently killed or injured by cars passing rapidly over such roads—sometimes in the night, sometimes in the day. No person saw the killing, or knew of the circumstances attending the same, except the engineer or other agents of the railroad company, and he alone knew that there was, or was not, negligence of the company, and he had strong motives to testify that there was no negligence. Hence, it was difficult, in many cases wholly impracticable, for the injured party to prove negligence, when, in fact, it existed. This became a serious public grievance. It, and no more, constituted the mischief to be remedied, and hence the statute. It properly applies, and was intended only to apply, to such cases. There was no necessity or reason why it should apply to such cases where a horse or other animal was so killed, or injured, in the presence and under the control of the owner, or some person in charge of them. In that case, the party injured, or some other person for him, saw and knew the circumstances of the killing, or injury, and could testify in a proper action as to the same—could prove the negligence of the company, if, indeed, there was negligence. There was no more reason in such case for the statute than in a case of the like killing of a man—indeed, in some instances, not so much, and the same may be said as to the like injury to property generally. This Court has, in effect, so repeatedly decided. In *Doggett* v. *Railroad Co.*, 81 N. C., 459, the late Chief Justice said: "Where injury to stock straying off is done by trains running at night, as well as by day, and known only to the defendant's employees, this (to make proof of negligence) was an almost impossible requirement. The owner would not know how, when, or where

the injury was done, while the servants of the road would possess knowledge of the facts. Hence, the General Assembly enacted the statute cited above, thus shifting the burden of proof from the plaintiff to the defendant, and requiring the latter to show the circumstances and repel the legal presumption. But when the facts are fully disclosed, and there is no controversy as to them, the Court must decide whether they make out a case of negligence, and if they fail to do this the defendants are not to be held liable. Such, we understand, to be the purpose and effect of the statute, and that, all the facts appearing, the defendant is charged or acquitted as negligence appears or is disproved." To the like effect are *Durham* v. *W. & W. R. R. Co.*, 82 N. C., 352, and *State* v. *Roten*, 86 N. C , 701; *Pippen* v. *Railroad Co.*, 75 N. C., 54.

Where words having a general and comprehensive meaning, as in this case, are employed in a statute, they must be taken, applied, and their meaning ascertained, in connection with the reason and purpose of it, and they may be enlarged or narrowed as to the scope of their meaning in order to effectuate the legislative intent clearly appearing. The subject, the reason and purpose of the statute indicate the sense in which the Legislature employed such words, and give them point and particular force and effect. 1 Bl. Com. 61; Pot. Dwar. on Stats., 175, 184, 185; *Hart* v. *Cleis*, 8 John, 44; *Brewer* v. *Blaugh*, 14 Ret. 178.

Unquestionably, the Court shall not make or unmake a statute, but it is its province—its duty—to give it just and reasonable interpretation and effect, according to the legislative intent thus appearing.