VIDAL, DEMANDANTE Y APELANTE, v. PORTO RICO RAILWAY, LIGHT & POWER CO., DEMANDADA Y APELADA.

APELACIÓN procedente de la Corte de Distrito de San Juan, Sección Segunda, en pleito sobre daños y perjuicios.

No. 2592.—Resuelto en febrero 18, 1924.

DAÑOS Y PERJUICIOS—EMBRIAGUEZ—NEGLIGENCIA—NEGLIGENCIA CONTRIBUTORIA— TRANSGRESOR (*Trespasser*).—El causante de la demandante fué muerto cuando se encontraba enteramente bajo la influencia del licor tendido en el suelo con sus piernas atravesadas sobre la vía en el derecho de paso de la demandada. La prueba tendió a acreditar que al ocurrir el accidente el sitio donde yacía y le produjo la muerte el carro de la demandada no formaba parte de la calle pública por razón de la costumbre, dedicación u otro motivo; que no existía ningún cruce en ese lugar; que el público no tenía razón especial para cruzar la vía allí, y que había pocas casas en esa vecindad particular. *Se resolvió:* que el finado fué un transgresor (*trespasser*) y que en un sitio que no era frecuentado, y en su servidumbre de paso, una compañía de trenes no tiene ningún deber de vigilar a los transgresores.

Los hechos están expresados en la opinión.

Abogado de la apelante: *Sr. M. Benítez Flores.*

Abogados de la apelada: *Sres. J. H. Brown y P. Amado Rivera.*

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

Los autos tienden a mostrar que Carlos Aguado y Vidal halló su muerte encontrándose en un estado de embriaguez; que mientras estaba completamente bajo la influencia del licor se encontraba sobre el terreno con sus piernas a través de uno de los railes de la vía del tren eléctrico conocido por Porto Rico Railway Light & Power Co., demandada en este caso; que fue muerto por un carro de la compañía

demandada mientras sus piernas estaban de tal modo atravesadas en la vía.   No había ninguna prueba que tendiera a acreditar que el sitio donde el accidente ocurrió era concurrido por el público.   Por el contrario, la prueba tendió a establecer que el sitio en cuestión en el momento del accidente no formaba parte del camino público por razón de la costumbre, dedicación o de otro modo; que no había cruce en el sitio en cuestión y que el público no tenía un motivo especial para cruzar la vía allí, y que en esa vecindad en particular había pocas casas.   En suma, era un sitio donde no existía ninguna razón para sospechar la presencia de una persona en la vía.   A poca distancia antes de llegar al sitio del accidente el tren cruza una calzada o terraplén, hace una curva y sigue después en una pequeña pendiente por algunos metros.   La corte declaró probado que, después de doblar la curva el motorista, de haber estado vigilante, pudo haber visto las piernas del demandante a unos 30 o 35 metros delante del sitio de la colisión y a tiempo para haber parado el carro.

Podemos decir que hubo alguna prueba tendente a demostrar que en la fecha del accidente, a diferencia de la fecha del juicio, un montón de piedras obstruía en cierto modo la vista del motorista.   Los autos muestran que se tomaron ciertas fotografías del sitio hacia el mismo tiempo de ocurrir el accidente y fueron admitidas como prueba. Una excepción fué tomada a la admisión de estas fotografías.   Sin embargo, ellas no forman parte de la prueba que ha sido transcrita.

La corte declaró probado en sustancia que la demandada fué culpable de negligencia al no tener vigilancia pero que la demandante no podía recobrar toda vez que el finado fué culpable de negligencia contributoria.   La apelante ha invocado la doctrina de última oportunidad (*last clear chance*). También declaró probado la corte que el motorista en verdad no descubrió el peligro en que estaba el finado hasta

encontrarse a unos cinco metros del sitio del accidente. Esta distancia, según la prueba en este caso, era evidentemente demasiado corta para poder parar el carro a tiempo.

Discutiremos la doctrina de la última oportunidad (*last clear chance*) porque ha figurado de modo muy prominente en nuestra consideración y su inaplicabilidad es decisiva en el caso.

La apelada insiste en que la doctrina de la última oportunidad (*last clear chance*) es únicamente aplicable cuando el peligro de una persona que ha sido muerta o lesionada se descubre verdaderamente a tiempo para evitar el accidente, y la mayoría de la corte ha estado inclinada a convenir con esto. No creemos que sea necesario resolver definitivamente esta cuestión. La apelada llamó la atención al caso de *Chunn v. The City & Suburban Railway of Washington*, 207 U. S. 302. Ese fué un caso apelado de la Corte de Apelaciones del Distrito de Columbia. En esa jurisdicción se aplica la doctrina de la última oportunidad (*last clear chance*) no sólo cuando el peligro de la persona lesionada se descubre efectivamente, sino también cuando en el ejercicio de un debido cuidado la demandada pudo haber descubierto el peligro. *Washington R. & C. Co v. Cullember*, 39 App. D. C. 324. En el caso citado últimamente también insiste la corte en que no había nada en la decisión de la Corte Suprema de los Estados Unidos en el caso de *Chunn, supra,* que excluya la posibilidad de la aplicación más amplia de la doctrina como fué aplicada por dicha Corte de Apelaciones del Distrito de Columbia. Verdaderamente que aun cuando algunas cortes, y especialmente las Cortes Federales, declaran que el descubrimiento real del peligro es un requisito previo a la aplicación de la doctrina, existen muchas otras cortes, y quizás el mayor número de ellas, que permitirán se pueda recobrar cuando el demandado en el ejercicio del debido cuidado debió haber descubierto el peli-

gro. *Bourrett* v. *Chicago & N. W. R. Co.*, 36 L. R. A. (N. S.) 957, y citas; 36 Cyc. 1565 *et seq.*

El precursor de todos los casos que dan aplicación al principio fue el de *Davies* v. *Mann*, anotado en 19 *Eng. Rul. Cases*, 190. 10 Mees. & Wels. 546. Un burro que se encontraba legalmente en el camino, pero atado, fué muerto por el demandado que venía en un carruage a una marcha muy ligera. La corte resolvió que el demandado pudo haber evitado el accidente en el ejercicio de un debido cuidado. La causa próxima de la muerte se atribuyó al acto del demandado al marchar a un paso muy ligero en la carretera y no parar. No se menciona para nada el verdadero descubrimiento del peligro. Aunque no era absolutamente esencial para la decisión en el caso de *Vargas* v. *Monroig*, 15 D. P. R. 27, citamos el de *Davies* v. *Mann, supra.* Dijimos que había muchos casos que resuelven que aunque un demandante podría, ejercitando cuidado, haber evitado el accidente, sin embargo, él puede recobrar si se demuestra que el demandado pudo haber evitado el accidente mediante el ejercio del debido cuidado. La prueba en el caso de *Vargas* no demostró que el peligro fué realmente descubierto. Quizás en cada caso la suposición de tal conocimiento estaba implícita en la decisión. Un examen, sin embargo, de toda la jurisprudencia nos convence de que una posición definitiva debe ser pospuesta para una presentación más amplia por los abogados.

Cuando el peligro realmente se descubre a tiempo para evitar el accidente, algunas cortes, bajo ciertas condiciones, prescinden de la negligencia contributoria de la persona lesionada. Con esta excepción, y dejando a un lado los casos de malicia o completo descuído, la regla, creemos, exceptuando tal vez en Missouri, es de aplicación universal de que la negligencia concurrente de la persona perjudicada impediría el poderse recobrar. *Drown* v. *Northern Ohio Traction Co.*, 10 L. R. A. (N. S.) 421; *Dyerson* v. *Union*

*Pacific Co.,* 7 L. R. A. (N. S.) 132; *Davies* v. *Mann, supra; Bourrett Chicago & N. W. R. Co.,* 36 L. R. A. (N. S.) 957 y anotación; *Robbins* v. *Pennsylvania Co.,* 245 Fed. 441; *Little Rock Ry. & Electric Co.* v. *Billings,* 187 Fed. 960, 25 R. C. L. 1258. Es decir, a pesar del deber del demandado de evitar el daño, una persona no puede recobrar si su misma negligencia continúa activamente hasta el momento del accidente. Cuando era igualmente posible para un demandante como al demandado evitar el accidente en el último momento, no surge ninguna acción. La aplicación más general de la doctrina de última oportunidad (*last clear chance*) tiene lugar cuando la persona lesionada fué originalmente negligente pero no tiene actualmente el poder o habilidad, más o menos claramente visible para el demandado, de evitar el accidente.

De acuerdo con esta idea de negligencia concurrente algunas cortes consideran que la negligencia de la persona perjudicada ha cesado cuando, estando bajo la influencia de la embriaguez, se cae en una vía de una compañía de ferrocarriles, pero otras consideran la embriaguez voluntaria de una persona como una negligencia que continúa. *Little Rock Railway & Electric Co.* v. *Billings;* 31 L. R. A. (N. S.) 1031 y nota monográfica. Si esta corte considerara la embriaguez del finado como negligencia contributoria, esta consideración sería decisiva del caso. De igual modo, sin embargo, con respecto a la proposición de si el peligro que no se descubre, permite la aplicación de la doctrina, preferimos posponer una decisión definitiva en cuanto a si la embriaguez voluntaria que coloca a una persona en una situación de desamparo ha de considerarse como un acto de negligencia que continúa. Dadas las prohibiciones de la Constitución de los Estados Unidos y las varias leyes del Congreso aplicables a Puerto Rico, es una cuestión seria el hecho de si la embriaguez voluntaria no debe considerarse como negligencia que continua y también si la persona que

se permite embriagarse hasta el punto de quedar enteramen desamparada no debe considerarse que ha intentado las consecuencias naturales y probables de su acto y es culpable de negligencia concurrente. En esta discusión estamos prescindiendo de ciertos actos del demandado que generalmente se resuelve constituyen la causa próxima del accidente. Está bien establecido que por lo general los actos de un hombre embriagado han de considerarse precisamente del mismo modo que si fuera sobrio.

Si el carro de la demandada iba a tal grado de velocidad que no podía parar, según se alega en uno de los párrafos de la demanda, entonces después de haber surgido la posibilidad de ver el peligro en que se encontraba el hombre sobre la vía no había ninguna oportunidad para parar el carro a tiempo. En todos los casos la aplicación de la doctrina depende de la posibilidad de evitar el peligro después de haber sido verdaderamente descubierto o de haberse podido descubrir en el ejercicio del debido cuidado. *State* v. *Cumberland etc. R. Co.,* 106 Md. 529, 16 L. R. A. (N. S.) 297; *Illinois Central R. Co.* v. *Nelson,* 173 Fed. 917; *Smith Metropolitan Street R. R. Co.,* 201 S. W. 569.

Que cuando un demandante intenta descansar en la aplicación de la doctrina de última oportunidad (*last clear chance*) debe alegar los hechos necesarios, se verá de las siguientes citas: *Drown* v. *Northern Ohio Traction Co.,* 10 L. R. A. (N. S.) 421; *Emmons* v. *Southern Pacific R. R.* (Oregon), 191 Pac. 334; *Hawkins* v. *Missouri K. & T. Ry. Co. of Texas,* 83 S. W. 52; *Hart* v. *Northern Pacific Ry. Co.,* 196 Fed. 188. Cuando la demandante descansa en un deber último o que sobreviene por parte de la demandada y un abandono de ese deber, a la demandanda debe dársele una oportunidad de defenderse contra tales cargos. La demanda en este respecto no es todo lo que debiera ser, pero como el apelado no discute este punto no insistiremos en él. Podemos decir de paso que la doctrina de la última oportu

nidad (*last clear chance*) no fué directamente considerada
por la corte, excepto en cuanto estaba contenida en una cita,
hecha aparentemente con otro fin.

Quizá una alegación pudiera no ser tan importante si el
demandado en el juicio se cruza de brazos y permite que
se invoque la doctrina. Artículo 136 y siguientes, Código
de Enjuiciamiento Civil, *El Pueblo de Puerto Rico* v. *Valdez*, 31 D. P. R. 223, resuelto en noviembre 28 de 1922.
Pero tal cosa no consta. Por el contrario, la opinión de la
corte sostuvo que la negligencia de la demandada consistió
en no tener un vigilante y entonces declaró que la demandada era culpable de negligencia contributoria. La doctrina
es aplicable no obstante á la negligencia contributoria y
aquí no hubo absolutamente ninguna consideración por parte
de la corte de la referida doctrina. No hay nada en los
autos, incluyendo los razonamientos de los abogados que
han sido transcritos, que demuestre que la demandante invocó la doctrina.

Pasando a la prueba, la corte declaró probado que el
carro iba corriendo a la mayor velocidad y que la demandada sólo vió el peligro a una distancia de cinco metros.
La corte declaró probado que el carro pudo haber sido parado dentro de una distancia de treinta metros o poco más,
pero no podemos convenir con la corte en que la prueba
tiende a acreditar ese hecho. La evidencia positiva de los
testigos de la demandada era en sentido contrario, y el testimonio de los testigos de la demandante en este respecto
no nos satisface en absoluto. Un carro que corre a treinta
millas por hora cubrirá cuarenta y cuatro pies por segundo.
En tres segundos se recorrería una distancia de 132 pies,
o más de cien haciendo concesión por la reducción en la velocidad. El poder parar un carro completamente dentro dé
tres segundos desde el momento en que el peligro se descubre sería una proeza, especialmente cuando han de considerarse los demás deberes de la demandada. El motorista

debe descubrir el peligro, aplicar sus frenos, y tiene la obligación principal de no ocasionar daño a nadie en su carro. Aun suponiendo una velocidad menor de treinta millas por hora no estaríamos convencidos por la prueba de que el carro pudo haber sido parado a tiempo. Cuando un carro eléctrico marcha a la mayor velocidad, cien pies o hasta quizás más, generalmente es necesario para parar el carro. En cuanto a razonamientos y hechos semejantes los siguientes casos son aplicables: *Kramer* v. *New Orleans City & L. R. Co.,* 51 La. Ann. 1689; *Royalty* v. *Lusk* (Mo. App.) 198 S. W. 472.

El demandante está en la obligación de probar todos los elementos necesarios para la aplicación de la doctrina. *Smith* v. *Metropolitan St. Ry.* Co. (Mo. App.) 201 S. W. 569; *Texas & P. R. Co.* v. *Buddow,* 90 Texas 26; *Pennell* v. *Chicago, Rock Island & Pacific,* 153 Mo. App. 566; *Kramer* v. *New Orleans City & L. R. Co.,* 51 La. Ann. 1689; *St. Louis & S. F. R. Co.* v. *Summers et al.,* 173 Fed. 358. Esto incluye la prueba de que el carro pudo haberse parado a tiempo.

La apelada insiste fuertemente en que la demandante dejó de probar un caso de negligencia. Por virtud de las autoridades citadas y en general, el peso de la prueba recaía en la demandante para demostrar el incumplimiento de un deber por parte de la demandada. Esta obligación comprende además el probar las condiciones peculiares que rodean el sitio donde el accidente ocurrió. Cuando hay siquiera una ligera prueba de que el sitio es concurrido o ha sido dedicado al público, el hecho de que el accidente ocurrió en la servidumbre de paso (*right of way*) del tren es de relativa insignificancia. Pero cuando la demandada, como aquí sucede, prueba que el accidente tuvo lugar en su servidumbre de paso, incumbe a la demandante la obligación de demostrar que el sitio quedó confundido en el camino público o era un sitio concurrido o algún otro elemento

semejante.   La prueba en este caso tendió a acreditar lo contrario.

El interfecto era un intruso (*trespasser*).  En su servidumbre y en un sitio no concurrido una compañía demandada no tiene deber alguno de guardar vigilancia para ver los intrusos (*trespassers*).   *Thompson on Negligence, Supp.*, sección 1709.

La demandante no nos ha demostrado nada que cree un deber por parte de la demandada de anticipar la presencia del finado en el sitio donde se le halló o de tener que encontrar allí cualquier otra persona.   Que no existía ningún deber de correr despacio en este sitio no concurrido las siguientes autoridades lo demuestran: *Morales* v. *P. R. Ry. L. & P. Co.*, 27 D. P. R. 769; *Olavarría* v. *P. R. Ry. L. & P. Co.*, 26 D. P. R. 645.

Nada se nos ha citado para probar que es el deber de una compañía de ferrocarriles antes de doblar una curva en su servidumbre de paso rebajar la velocidad o prever la presencia de personas en un sitio no concurrido. Por supuesto que un demandado no debe correr en una curva con completo descuído en un sitio concurrido.   Después de doblar la curva a una velocidad permisible era imposible haber parado este carro a tiempo, de modo que la supuesta violación del deber aquí no tiene conexión causal con el accidente.

En suma, la embriaguez del finado fué la causa próxima del accidente y no se demostró ninguna negligencia que proviniera por parte de la demandada.

Incidentalmente hemos discutido un número de señalamientos de error y consideraremos algunos de los otros.

La corte declaró probado que la demandada no vió al finado hasta que el carro se encontraba a cinco metros de distancia y por tanto que su falta, si alguna tuvo, al no aplicar los frenos de emergencia no pudo haber sido la negligencia que origina el accidente.

El mero hecho de que una persona sea un empleado de la compañía no la incapacita para declarar como perito.

La apelante no nos convence de que la prueba del hábito de la embriaguez es enteramente impertinente; ni que la declaración de los testigos de la condición del finado en el mismo día poco antes de ocurrir el accidente es inadmisible. Ni siquiera que una persona tenga que ser un perito para declarar sobre la embriaguez de otra persona.

Un error que ha sido alegado nos ha ocasionado alguna dificultad. Algunas manifestaciones de los testigos en cuanto a la embriaguez fueron admitidas exclusivamente por la teoría de que el hábito de la embriaguez tiende a rebajar la capacidad para ganarse la vida y por tanto la cuantía de los daños y perjuicios. Sin embargo, en su opinión la corte se refiere a alguna de la prueba así aportada como actos tendentes a establecer la embriaguez actual.

La prueba de embriaguez fué clara y convincente y la corte puede haber sido descuidada al referirse a esa prueba como que tendía a establecer el hecho principal. Como ya hemos dicho, no estamos convencidos de que los hábitos de embriaguez no pueden tener cierta pertinencia. El error, de haber alguno, no fué perjudicial toda vez que la prueba, por tender a mostrar un actual estado de embriaguez, era meramente cumulativa. El único resultado de devolver este caso por este fundamento sería que la corte todavía necesariamente encontraría un estado de embriaguez al ocurrir el accidente. Encontraríamos una condición de embriaguez si la corte hubiera declarado otra cosa. La apelada no trató de ofrecer la supuesta prueba inadmisible con ningún otro fin que para rebajar los daños y no hay nada que indique un esfuerzo para que se considerara una prueba indebida. Además la embriaguez, *vel non,* no tiene relación, si como hemos declarado, no se demostró ninguna negligencia de la demandada que originara el accidente.

Sobre la cuestión de la omisión en cumplir su deber en

tener una vigilancia, o la cuestión de la forma en que el carro debió haber sido corrido en este sitio que se alega no era concurrido, se ofrecieron como prueba fotografías. Ellas no han sido certificadas a esta corte en ninguna forma y por tanto no estamos en condiciones de revocar desde ningún punto de vista. Se formuló objeción a la admisión de estas fotografías por no haber sido identificadas por el fotógrafo; pero lo mismo que las firmas y otros particulares, las personas que demuestran un verdadero conocimiento pueden identificarlas.

Otros supuestos errores o han sido considerados necesariamente por nosotros, o debido a su falta de especificación, no requieren ulterior consideración.

Debe confirmarse la sentencia apelada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Asociados Aldrey, Hutchison y Franco Soto.

El Juez Presidente Sr. del Toro disintió.

### OPINIÓN DISIDENTE DEL JUEZ PRESIDENTE SR. DEL TORO

Laura Vidal viuda de Aguado entabló demanda contra la Porto Rico Railway, Light & Power Co. en reclamación de daños y perjuicios sufridos a consecuencia de la muerte de su hijo Carlos Aguado y Vidal ocurrida a virtud de negligencia de la demandada en el manejo de uno de sus carros eléctricos, el 26 de agosto de 1917.

La demanda fué declarada sin lugar y la demandante recurrió para ante esta Corte Suprema, señalando en su alegato la comisión de veinte errores. Según la opinión que del caso he formado, su estudio debe concentrarse en tres cuestiones fundamentales, de importancia decisiva, a saber: ¿Resulta o no de los hechos declarados probados y de la prueba la negligencia de la demandada? ¿Existió o no negligencia contributoria por parte del hijo de la demandante?

Aun en el caso de existir negligencia contributoria, ¿tuvo la demandada la última oportunidad de evitar el daño?

El juez sentenciador se expresó así:

"La demandante es mayor de edad, viuda, vecina de San Juan y madre legítima de Carlos Aguado Vidal, y la demandada es una corporación organizada bajo las leyes de Puerto Rico, con oficina principal en San Juan, y dueña de una línea férrea de tranvías movidos por fuerza eléctrica, que se extiende desde San Juan a Santurce y de San Juan a Río Piedras, sobre la cual circulan los carros de su propiedad dedicados al servicio de transporte, de pasajeros entre San Juan, Santurce y Río Piedras. Tiene, también, un ramal que parte de la línea general, cerca del puente de San Antonio en Santurce, atraviesa el suburbio del Condado, y llega hasta el Parque Borinquen.

"El día 26 de Agosto de 1917, como a las 12.30 p. m., uno de los carros eléctricos de la demandada, el número 31, entre las paradas 55 y 54, en la línea del Condado, en un paraje cercano al puente 'Dos Hermanos,' marchando desde San Juan hacia el Parque, y a velocidad máxima, en las inmediaciones de la parada 55 arrolló a Carlos Aguado Vidal, fracturándole ambas piernas, a consecuencia de lo cual falleció a las pocas horas. En los momentos del suceso Aguado Vidal se hallaba tendido en el suelo con sus piernas colocadas sobre uno de los railes de la vía. El motorista que guiaba el carro vió el cuerpo cuando estaba solamente a cinco metros de distancia, y entonces trató de detener el carro aplicando el freno de emergencia, o sea el aparato para dar contramarcha, no pudiendo evitar que dos de las ruedas delanteras y una de las posteriores pasasen sobre las piernas de Aguado. El sitio del accidente, según pudimos ver en una inspección ocular, es la punta oeste de la península del Condado, y a pocos metros del extremo oriental del terraplén que atraviesa la bahía del Condado, desde el puente 'Dos Hermanos' hacia dicha península. La línea férrea sobre la calzada, y en una extensión de 400 metros, aproximadamente, es recta, pero desde el final del terraplén hacia la parada 54, tiene una ligera curva que se desarrolla en suave pendiente. El carro marchaba a su mayor velocidad y llevaba abierto el regulador hasta los nueve puntos; y el motorista, al aproximarse a la parada 55, que es la más próxima a la calzada o terraplén, no trató de disminuir la velocidad, sino hasta el momento preciso en

que se dió cuenta de que Aguado estaba tendido con sus piernas sobre uno de los railes.''

Sintetiza luego las alegaciones de la demanda y de la contestación y estudiando los elementos de negligencia alegados en relación con las pruebas y la jurisprudencia, dice:

''*Velocidad inmoderada.*—La parada 55 no es parada obligatoria de los carros eléctricos; se hace cuando hay pasajeros que deseen desmontarse o subir. No se ha probado que hubiera persona alguna esperando en la parada ni que, los viajeros que iban en el carro manifestasen deseos de desmontarse allí. La línea se extiende por el suburbio del Condado. No ,constituye negligencia *per se* que una compañía de carros eléctricos correr sus carros rápidamente en un suburbio. Morales v. P. R. R. L. & P. Co., 27 D. P. R. 796. Citando a Olavarría v. P. R. R. L. & P. Co., 26 D. P. R. 645 y otros casos más.

''*Estado de los frenos.*—Se alega que los frenos, especialmente el de emergencia, estaban en tan defectuosas condiciones que, a causa de su imperfección, defectos e inseguridad, la marcha del vehículo no pudo ser detenida a tiempo para evitar el accidente. La prueba demuestra que, aunque se trataba de un carro de más de 8 años de servicios, el freno de emergencia, que es el aparato para dar contramarcha, estaba en buen estado. Ese aparato se aplica para cambiar la dirección en que las ruedas se mueven; es el mecanismo para detener el vehículo en la menor distancia, más rápidamente. El carro número 31, tenía, además, frenos del tipo Standard, que funcionan por presión sobre las ruedas. Este freno no fué usado porque el motorista entendió que, para detenerse cuanto antes, era más eficaz, por lo rápido, el aparato de contramarcha. Otros testigos fueron de igual opinión. No se ha probado que ni dicho aparato ni el freno Standard, estuviesen en condiciones defectuosas.

''*Obligación del motorista de haber visto el cuerpo de Aguado.*— Se alega que otra de las causas del accidente fué que 'el motorista, desde su sitio, distinguía, pudo distinguir y distinguió perfectamente el cuerpo del fallecido a una distancia mayor de treinta metros, suficientes para haber parado a tiempo, evitando el suceso.' El propio motorista declaró que se dió cuenta de que Aguado yacía tendido en el suelo, y sus piernas sobre la vía, a unos cinco metros de distancia. ¿Pudo verlo antes? Creemos por lo que pudimos comprobar en la inspeción ocular, que el motorista pudo

notar que las piernas de un hombre estaban sobre la vía, desde, por lo menos, 30 o 35 metros antes de llegar al sitio. ¿Tuvo obligación de verlo? Antes de llegar a la parada 55 y aun convencido de que no había persona alguna esperando en ella, por precaución, al tomar la curva, debió el motorista examinar la vía para cerciorarse de que el trayecto a recorrer estaba libre de obstáculos peligrosos. ¿Tenía o no el deber de examinar constantemente en todo tiempo y lugar el estado de la vía para evitar accidentes?

"Si las funciones del motorista fueran sólo las de hacer andar y parar el carro, probablemente, se habría ya inventado algún aparato que, automáticamente, le sustituyese; pero no es así; el motorista dirige la marcha del vehículo, observa la vía, detiene el carro cuando hay pasajeros que lo esperen en las paradas o cuando el conductor le ordena detenerse para que otras se desmonten; y además, debe estar pendiente del estado de la vía y decidir discrecionalmente cuándo debe o no detener el carro, en aquellas ocasiones en que algo obstaculice la vía, y en que, de continuarse la marcha, pueda causarse daño o ponerse en peligro la vida o seguridad de los que están en el carro, o fuera de él.

"Creemos que el motorista en aquel sitio, desde 30 o 35 metros antes de llegar, pudo ver las piernas de Aguado y tuvo el deber de llevar la vista fija en la vía, para así notar cualquier obstáculo que en ella hubiera. Si omitió cumplirlo, y si, como el propio motorista, Tomás Ramírez declaró, no vió a Aguado sino a unos cinco metros de distancia, precisa concluir que el accidente, en parte, a la omisión del estricto cumplimiento de ese deber."

Seguidamente entra en la segunda de las cuestiones a que me referí al principio, así:

"En parte, decimos, porque la demandada ha establecido como defensa la negligencia contribuyente del interfecto y es innegable que en ella se encuentra otra concausa directa e inmediata del fatal suceso.

"¿Qué hacía Aguado tendido sobre la vía en aquella posición? Dice la demandante que había caído víctima de un síncope o indisposición repentina. No nos es dable presumirlo, por estar allí caído. Tal presunción quedaría desvirtuada con la prueba de lo contrario que presentó la demandada.

Sigue analizando las pruebas y concluye que si estaba

tendido sobre la vía se debía a su estado de intoxicación alcohólica.

"Esas circunstancias y la falta de estricta vigilancia del motorista para cerciorarse de si la vía estaba expedita, coadyuvaron inmediata y directamente al accidente.

"'En el caso de Dickson vs. Chattanooga Ry. Light y Power Co., 237 Fed. 352, la Corte de Circuito de Apelaciones del Sexto Circuito dijo lo siguiente:

"'Está bien establecida la doctrina de que quien es lesionado por un tranvía urbano puede recobrar por tal lesión, a pesar de su propia negligencia, inicial o precedente, al exponerse al peligro, siempre que, en el momento del accidente, esté usando la calle o camino propia y legítimamente, y su negligencia haya terminado.

"'Por otra parte está igualmente decidido que quien hace uso ilegal, impropio de una vía, ya de ferrocarril, convirtiéndose en intruso (*trespasser*), y al proceder así, se coloca en situación tal que pueda ser arrollado por un tren o carro circulante, no puede recobrar por las lesiones recibidas, a menos que los que tuvieren a su cargo el tren o carro urbano, mediante el ejercicio de cuidado y diligencia razonables, después de descubrir el peligro, pudieran haber evitado el accidente. * * * Los empleados de una compañía ferroviaria que opera sus trenes y carros, no tienen la obligación, para con un intruso que se interpone en la vía, de sostener una vigilancia para protegerle; su único deber es el de ejercitar el debido cuidado después del descubrimiento del peligro en que se encontrare el intruso. . . . . Nadie pondrá en duda que un hombre ebrio que vaya desde la acera de una calle pública contigua a una propiedad privada, y se acuesta en la vía, es un intruso, y continúa siéndolo en tanto permanece allí, cualquiera que sea el grado de intoxicación.' . . . .

"Lo anterior ha sido también, sustancialmente, sostenido por nuestra Corte Suprema en el caso de Font vs. P. R. R. L. & P. Co., 21 D. P. R. 7. La Corte declaró que el demandante estaba impedido de reclamar por haberse probado que, al ser arrollado por el tranvía eléctrico estaba jugando sobre unos tablones que había sobre la vía, con objeto de facilitar el paso a través de la misma. La corte cita los casos 119 Mass. 472 y 24 A. R. 23 y 27 L. R. A. 527, y resume la doctrina diciendo que aun cuando pudiera deducirse de la prueba que la compañía demandada había sido negligente en cierto modo con la colocación de los tablones,

la negligencia contribuyente del demandante fué tan clara que nunca permitiría dictar una sentencia favorable a sus pretensiones.''

De suerte que las conclusiones de la corte sentenciadora fueron: 1, existió negligencia por parte de la demandada; 2, existió negligencia contributoria por parte de Aguado de tal naturaleza que debe considerarse como la verdadera causa del accidente, y 3, en tal virtud, la demanda debe declararse sin lugar, sin especial condenación de costas.

La demandada no recurrió de la sentencia. Fué dictada a su favor, pero en su alegato sostiene que no hubo prueba de negligencia por su parte, impugnando así la primera de las conclusiones a que llegó la corte sentenciadora. A mi juicio no tiene razón la demandada.

Antes de dictar sentencia, la corte examinó el sitio donde ocurrió el accidente.

El propio motorista que guiaba el carro que produjo la muerte de Aguado, declarando como testigo de la demandada dijo:

''y al tomar la curva, yendo el carro a su velocidad y a la entrada de la curva vió a un hombre en la vía, nada más que ya que estaba el carro encima, como a cinco metros, como las piernas de un hombre sobre la vía, el cuerpo casi no se notaba por estar en medio de dos montones de piedra, solamente se notaban como las piernas sobre el rail derecho, por más que yo allí me forcé, después que noté que era un hombre, que estaba tendido, que tenía las piernas sobre un rail, puse la contramarcha del carro hice todos mis esfuerzos por librar que el carro lo cogiera y siempre el carro llegó donde estaba el individuo y le cortó las piernas.''

Y luego agregó:

''Que la vía era casi recta; que él iba pendiente del camino, de la vía; que se podía ver a una distancia mayor de cinco metros, refiriéndose al espacio entre los dos railes.''

Marcelino Saldaña, un cabo de la policía insular que via-

jaba en el carro, ocupando uno de los asientos delanteros, depuso:

"Que desde el asiento en que el declarante iba podía verse bastante lejos, pero nunca menos de 40 metros, podría verse un poco más porque ese asiento da acceso a la persona que lo ocupa que vea primero que el mismo motorista. Que ese día vió el cuerpo de un hombre tendido en la vía; que lo pudo ver; que distinguió el cuerpo como a una distancia de 40 metros; que él notó que el motorista se dió cuenta exacta, inmediatamente que él, porque él vió que el motorista trataba de parar con mucho esfuerzo su carro, pero no pudo conseguirlo; que el motorista empezó a hacer maniobra a una distancia de 40 metros, a parar su carro al mismo tiempo que el declarante se había dado cuenta exacta del cuerpo; que el carro no alcanzó a parar, el freno parece que todavía quedaba mucha cadena que envolver o algo así; no paró, que siguió corriendo y llegó al sitio del individuo; que consiguió pararlo después que le había pasado por las piernas; que después de todo esto fué que el motorista consiguió parar el carro."

Repreguntado insistentemente, sostuvo sus afirmaciones. Es cierto que la demandada trató de impugnar su veracidad y que en efecto parecen exageradas sus manifestaciones referentes a haber gritado cuando vió las piernas del hombre a cuarenta metros, pero el hecho de que a tal distancia podían verse, parece la realidad misma de las cosas.

En resumen, los hechos últimos en el extremo examinado, apreciando la prueba del modo más favorable a la demandada, son: el motorista vió las piernas de Aguado a cinco metros y pudo verlas a treinta o cuarenta si hubiera inspeccionado con su vista la vía al doblar la curva, si hubiera simplemente mirado hacia adelante, hacia la próxima parada, cumpliendo así con uno de sus deberes más elementales y sencillos. El testigo de la propia parte demandada, Luis Calderón, inspector de sus carros, contestando a preguntas del juez, dijo: "que el motorista cuando se aproxima a una parada, tiene la obligación de mirar si en la otra parada hay algún pasajero."

Ahora bien, ¿puede un carro eléctrico parar a treinta metros de distancia? La prueba es contradictoria.

Francisco Becerra, ingeniero electro-mecánico, testigo de la demandante, declaró:

"bajo estas condiciones, tomando como base que el carro está en buenas condiciones y dadas las condiciones de la curva y la pendiente, cree que un carro puede parar a una distancia de ocho a diez metros, contando desde donde el motorista empieza a hacer esfuerzos para pararlo hasta el sitio donde se pare. Que en un sitio como aquél, desde el primer momento que el motorista ha empezado a hacer esfuerzos hasta el sitio que para, si el carro está en perfectas condiciones, debe parar a una distancia de ocho a diez metros como máximo. El abogado hace cierta pregunta que el demandado se opone y la corte no la admite; el demandante retira la pregunta.—Que un carro a esta velocidad en aquel sitio, con los obstáculos de que han hablado la curva y la extensión del carro, etc., debe parar si está en perfectas condiciones, y va a toda velocidad a una distancia no mayor de ocho a diez metros."

Y Samuel Patterson, testigo de la demandada, inspector de la línea, depuso:

"a la pregunta que le hace el señor juez, de que aplicando el aparato de contramarcha a un carro que va a una velocidad que dan los nueve puntos, en cuántos metros puede parar, responde, que eso depende del camino que está sirviendo, o como está el camino si está seco o mojado, y que si el carro está andando a nueve puntos puede parar en menos de sesenta metros, que es una buena parada; que sí puede el carro en menos de sesenta metros parar en una buena parada de emergencia. J.—La pregunta de la corte es a qué distancia, a esa velocidad de los nueve puntos, en condiciones de la vía seca y a esa velocidad, ¿qué distancia es lo menos que el carro puede recorrer para parar? T.—Como cincuenta metros."

Es la eterna historia de la prueba pericial. Testigos instruídos que generalmente ponen su inteligencia y sus conocimientos técnicos al servicio de la parte que los presenta y que constituyen en muchas ocasiones uno de los riesgos mayores que un juez encuentra para impartir justicia. Quizá el perito Becerra exageró, pero a mi juicio su decla-

ración merece más crédito que la de Patterson.   No concibo que en el estado actual de progreso de la mecánica, un carro eléctrico subiendo una suave pendiente necesite cincuenta metros para parar, no pudiendo hacerlo en treinta metros.

Establecidos los hechos y las conclusiones que anteceden y a fin de evitar una larga discusión sobre la prueba y las excepciones tomadas, puede aceptarse el debate en el terreno que la plantea la propia parte demandada, a saber: que el sitio en que se encontraba Aguado no era una calle pública, ni un cruce, ni una parada obligatoria y que, por tanto, Aguado estaba allí sin derecho alguno.   Puede aceptarse algo más esto es, que la inconsciencia de Aguado o el hecho de haber caído con las piernas sobre la vía y así permanecido, se debió a su estado voluntario de embriaguez. Puede reconocerse, en fin, la negligencia contributoria de Aguado, y eso no obstante, habiéndose probado que el motorista pudo ver a Aguado con sus piernas tendidas sobre la vía por lo menos a treinta metros de distancia si hubiera ejercitado un cuidado razonable en el cumplimiento de los deberes de su cargo, y pudo parar y evitar de tal modo el accidente, y no lo hizo, la demandada es responsable.

No toda la jurisprudencia sostiene mi criterio.   Ruling Case Law, resumiendo un buen número de decisiones, se expresa así:

"La regla generalmente aceptada de que una compañía de ferrocarriles no tiene ninguna obligación hacia una persona que penetra ilegalmente en su propiedad o vías, menos cuando descubre su peligro, es igualmente aplicable a las compañías urbanas de ca rros eléctricos.   Si bien tales compañías son responsables por los daños que voluntaria e. injustificadamente se ocasionen a los que penetran sin permiso en sus vías, es únicamente cuando aquellos que están funcionando un tren no ejercen razonable cuidado para evitar causar daño al transgresor, después que ha sido visto y el peligro para él es aparente, sólo entonces es que dichas compañías son consideradas culpables de completo abandono o descuido de tal modo

que queda anulada la negligencia contributoria del transgresor. Un infractor y transgresor no puede recobrar por daños que son la consecuencia combinada de su propio acto ilegal y de la negligencia de otro, y esto es así aunque la persona que ha recibido el daño sea un niño y sólo haga lo que se puede esperar que realicen razonablemente los niños de su edad e inteligencia." 25 R. C. L. 1236.

Pero creo que puede y debe irse más lejos. De ahí que haya concluído que sin necesidad de tomar por base la declaración de Saldaña que colocaría el caso enteramente dentro de la regla, tal como se expone en Ruling Case Law, la responsabilidad de la demandada es evidente no obstante la negligencia de Aguado, porque ella teniendo la última oportunidad de evitar el accidente si hubiera su motorista cumplido con su deber elemental de inspeccionar la vía por la cual estaba encargado de conducir el carro, no lo hizo. Y digo deber elemental pensando no sólo en aquellos que pudieran ocupar con derecho o sin él la vía, sino en los pasajeros que la compañía se obligó a transportar con seguridad por una vía franca. Si en vez de las frágiles piernas de un ser humano, alguna barra de acero hubiera sido colocada firmemente en el mismo sitio, el carro hubiera saltado de la vía y los pasajeros hubieran quedado expuestos a los peligros consiguientes. No cabe imaginar obligación más clara. Cuando pienso en este caso sólo puedo concebir que el motorista dejara de ver las piernas de Aguado, no ya las piernas, el cuerpo todo de Aguado, a cuarenta metros de distancia, a virtud de un abandono absoluto de su puesto, mirando a otro lado y dejando el carro correr a su propio impulso.

El criterio legal que sustento no está desprovisto de apoyo en la jurisprudencia americana. Me fundo en la lógica de los hechos y especialmente en repetidas decisiones de la Corte Suprema de la Carolina del Norte. Cuanto pudiera decir está dicho y discutido admirablemente en la opinión emitida por el juez Avery en el caso de *Pickett* v.

*Wilmington & W. R. Co.*, decidido el 19 de noviembre de
1895.   En parte dicha opinión dice:

"La cuestión más importante presentada en la apelación es si
la corte cometió error al negarse a instruir al jurado que si el causante del demandante deliberadamente se acostó en la vía, y ya por
descuido o intencionalmente se quedó dormido allí, la demandada
no era responsable a no ser que el maquinista realmente viera que
él se encontraba acostado allí, en tiempo para haber parado el tren
antes de alcanzarlo, mediante el uso razonable de los aparatos a
su cargo.   *   *   *

"En el caso de Herring v. Railroad Co., 10 Ired.  402, esta
corte observó la doctrina que entonces era la generalmente aceptada,—que las personas que penetraban en las vías de ferrocarriles
en otros sitios que no fueran cruces públicos eran transgresores, a
quienes el porteador no debía ninguna obligación de vigilancia, y
por la seguridad de las cuales en manera alguna era responsable, a
menos que su maquinista ciertamente viera que había peligro de
causar daño debido a una colisión, y voluntariamente dejara de
poner en práctica los medios por los cuales podía él evitarlo.   En el
caso de Gunter v. Wicker, 85 N. C. 310, esta corte sancionó el
principio que primeramente fué formulado distintamente en el caso
de Davies v. Mann, 10 Mees. & W. 545, de que 'a pesar de la previa negligencia del demandante, si al ocurrir el daño pudo haberse
evitado mediante el ejercicio de razonable cuidado y prudencia por
parte de la demandada, procederá una acción por daños y perjuicios.'   Esta doctrina fué subsiguientemente aprobada en los casos
de Saulter v. Steamship Co., 88 N. C. 123; Turrentine v. Railroad Co., 92 N. C. 638; Meredith v. Iron Co., 99 N. C. 576, S. E.
659; Roberts v. Railroad Co., 88 N. C. 560; Farmer v. Railroad
Co., Id. 564; Bullock v. Railroad Co., 105 N. C. 180, 10 S. E. 988;
Wilson v. Railroad Co, 90 N. C. 69; Snowden v. Railroad Co., 95
N. C. 93; Carlton v. Railroad Co., 104 N. C. 365, 10 S. E. 516;
Randal v. Railroad Co., 104 N. C. 410, 10 S. E. 691.   Y en esos casos
se declaró repetidamente que constituía negligencia por parte del maquinista de una compañía de ferrocarriles el no ejercitar razonable cuidado en mantener un aviso, no sólo para el ganado y otras
obstrucciones, sino para los seres humanos aparentemente desamparados o enfermos que se encuentran en la vía, y que el incumplimiento de esto, que tiene lugar después de la negligencia de otra
persona, donde las personas o animales estaban expuestos a peli-

gro, sería considerado como la causa próxima de cualquier daño resultante.

"Fué después de todos estos precedentes siguiendo el caso de Gunter v. Wicker, *supra,* que la corte en el de Deans v. Railroad Co., 107 N. C. 686, 12 S. E. 77, se vió frente al problema de si una compañía de ferrocarriles era responsable cuando mediante el cuidado ordinario su maquinista pudo haber parado su tren a tiempo para evitar arrollar a un hombre que estaba dormido en su vía, según la doctrina de Gunter v. Wicker, o si, habiendo ocurrido el accidente en un sitio que no era un cruce público, podía ser responsable la compañía, bajo la regla expresada en el caso de Herring v. Railroad Co., únicamente cuando se demostraba que el maquinista ciertamente vió al infractor. y tenía razonable motivo para darse cuenta de su. situación. Después de una consideración más detenida, la corte revocó el caso de Herring y declaró que la regla aplicable en tales casos era que 'si el maquinista descubre, o mediante razonable vigilancia puede descubrir, a una persona acostada en la vía, dormida o embriagada, o ve a un ser humano que sabe que no es cuerdo o por otro motivo insensible al peligro, o que no puede evitarlo, en la vía y enfrente de él, su deber es resolver todas las dudas en favor de la conservación de la vida de la persona, e inmediatamente emplear todos los medios a su alcance para pararlo, sin tener que poner en peligro la vida de los pasajeros en el tren.' Esta regla fué aprobada en términos expresos en los casos de Meredith v. Railroad Co., 108 N. C. 618, 13 S. E. 137; Hinkle v. Railroad Co., 109 N. C. 472, 13 S. E. 884; Clark v. Railroad Co., 109 N. C. 444, 445, 14 S. E. 43; Norwood v. Railroad Co., 111 N. C. 240, 16 S. E. 4; Cawfield v. Railroad Co., 111 N. C. 600, 16 S. E. 703." .

Continúa la opinión analizando extensamente las diversas teorías y decisiones sobre la materia, y termina:

"Somos de opinión de que cuando mediante el ejercicio del debido cuidado un maquinista puede ver que un ser humano está acostado al parecer sin auxilio de ninguna clase, en la vía y frente a su máquina, en tiempo para poder parar el tren mediante el uso de los aparatos a su cargo, y sin peligro a la seguridad de las personas en el tren, la compañía es responsable por cualquier daño proveniente de su omisión en cumplir su deber. Si es la regla establecida en North Carolina (según hemos indicado) que es el

deb'er de un maquinista en un tren en marcha mantener una vigilancia razonable en toda la vía frente a él, entonces el no hacer esto es una omisión de un deber legal. * * * La corte no cometió error alguno del cual podía quejarse justamente la demandada, al exponer la regla general que hemos estado discutiendo.''

Pickett v. Wilmington & R. Co., 23 Southeastern Rep. 265-268.

Por virtud de lo expuesto, opino que debe revocarse la sentencia apelada y dictarse por el Tribunal Supremo la que proceda en justicia.